## UNITED STATES v. NEW YORK GREAT ATLANTIC & PACIFIC TEA CO., Inc., et al.

### Criminal No. 16153.

District Court, E. D. Illinois.

Sept. 21, 1946.

Great Atlantic & Pacific Tea Company of America, a Maryland corporation, The Great Atlantic & Pacific Tea Company, a New Jersey corporation, The Great Atlantic & Pacific Tea Company, an Arizona corporation, The Great Atlantic & Pacific Tea Company, a Nevada corporation, The Great Atlantic & Pacific Tea Corporation, a Delaware corporation, The Great Atlantic & Pacific Company of Vermont, Inc., a Vermont corporation, The Quaker Maid Company, Inc., White House Milk Company, Inc., Nakat Packing Corporation, and Atlantic Commission Company, Inc., all New York corporations and The American Coffee Corporation, a New Jersey corporation.

Certain individuals comprise the so-called headquarters defendants, as follows: George L. Hartford, president of the first above named corporation; chairman of the board of directors of the second; president and director of the Great A & P Tea Co., Ltd., Canada, secretary and director of Atlantic Warehouses, Inc., N. Y., Great American Tea Co., N. Y., and the Arizona corporation; treasurer and director of the New Jersey and Nevada corporations and director of the Delaware corporation. John A. Hartford, first vice president and director of the first named corporation, president and director of the Maryland, the Arizona, the New Jersey, the Nevada and the Delaware corporations and of The Great American Tea Company, New York; treasurer and director of Atlantic Warehouses, Inc., New York, vice president and director of The Great Atlantic & Pacific Tea Co., Ltd., Canada. R. W. Burger, assistant secretary of the Arizona, the New York and the Nevada corporations, the American Coffee Corporation, Nakat Packing Corporation, the Atlantic Commission Company, the Great American Tea Company, the Atlantic Warehouses, Inc., and The Great Atlantic & Pacific Tea Co., Ltd., secretary of the New Jersey and Maryland corporations, secretary and director of the Delaware corporation, assistant secretary and director of the Quaker Maid Company, secretary-treasurer and director of White House Milk Company, vice president, Stores Publishing Co., Inc., New York. Robert B. Smith (now deceased), vice president and director

Holmes Baldridge, Horace L. Flurry, Earl A. Jinkinson, Richard B. O'Donnell, Walker Smith, Margaret H. Brass, Richard L. Porter, and Sigmund Timberg, Sp. Assts. to Atty. Gen., Wendell Berge, Asst. Atty. Gen., and William W. Hart, U. S. Atty., and Ray M. Foreman, Asst. U. S. Atty., both of Danville, Ill., for plaintiff.

W. M. Acton and Paul F. Jones, both of Danville, Ill., and Henry I. Green, of Urbana, Ill. (Carruthers Ewing, of New York City, George J. Feldman, of Washington, D. C., Sumner S. Kittelle, of New York City, Charles R. Fox, of Detroit, Mich., John N. Touchstone, of Dallas, Tex., Henry S. Rademacher, of Chicago, Ill., Enos L. Phillips, of Urbana, Ill., V. W. McIntire, of Danville, Ill., E. J. Donahue, of Derby, Conn., and Ralph B. Schipa, of New York City, of counsel), for defendants.

LINDLEY, District Judge.

The information in this cause charges, in the first count, that defendants unlawfully formed and carried out, in part within the Eastern District of Illinois, a combination and conspiracy unreasonably to restrain interstate commerce in food products; and, in count two, that they entered into and carried out, in the same manner, a conspiracy to monopolize a substantial part of such products in interstate commerce, all in violation of the Sherman Act, 15 U.S. C.A. §§ 1–7, 15 note.

The corporate defendants are: The New York Great Atlantic & Pacific Tea Company, Inc., a New York corporation, The

of the Maryland, New Jersey and Nevada corporations, and of the White House Milk Company; president and director of Nakat Packing Corporation, the Atlantic Commission Company, and the Quaker Maid Company and vice president of Stores Publishing Company. David T. Bofinger, vice president and director of the New Jersey corporation and the Stores Publishing Company. R. G. Ernst, vice president of the Quaker Maid Company. Francis M. Kurtz, vice president, American Coffee Corporation, New Jersey. H. A. Baum, vice president, general manager and director of Atlantic Commission Company, New York.

Other defendants are: O. C. Adams, chairman of the board of the Atlantic division; W. F. Leach, president of the Atlantic division; W. M. Byrnes, president of the Eastern division; J. J. Byrnes, president, New England division; R. M. Smith, president, Southern division; O. I. Black, general superintendent of Dallas unit; T. A. Connors, agent in charge of the national meat department of A & P; A. W. Vogt, agent in charge of the buying office, Milwaukee, Wisconsin; Business Organization, Inc., a New York corporation, and Carl Byoir, chairman of its board.

The information sets forth at some length the respective participating activities of the members of A & P group in the food industry of the United States. It avers and the fact is that the New York corporation and the Maryland corporation are holding companies, the first holding the stock of the other and the latter that of the other corporate defendants except the Vermont corporation which is owned by the New Jersey corporation; that defendants George and John Hartford, as trustees of the George H. Hartford Trust hold all the authorized and issued voting stock of the New York corporation and, individually and as trustees, 99.97% of the authorized capital stock of that corporation; that besides retailing food through retail stores, the group processes, packs and wholesales food products and engages in brokerage business in such products.

It is charged that headquarters control the buying; that the purchasing department is located at headquarters where food products to be retailed are purchased; that in various states, there are located other offices, known as buying and brokerage offices, where A & P's agents and employees, under the direction of the grocery purchasing department, purchase various products, all of which are shipped to A & P warehouses and from there forwarded in interstate commerce to the retail stores, and that the stores, 6412 in number, in 3436 cities, constitute the conduit through which food products are moved in commerce from producers to consumers. It is charged that headquarters also control the selling and advertising of the entire group, dictate where stores shall be located and suggest profit rates and expense rates for all the stores.

All defendants [1] entered pleas of not guilty and both sides waived trial by jury. Voluminous evidence was submitted, both oral and documentary. The Government relies upon the records made by defendants in their corporate and group meeting minutes, their communications with each other and with others, testimony of suppliers from whom A & P bought food products, and that of producers of fruits and vegetables and the officers or agents of cooperatives producing and selling such produce. Defendants produced controverting evidence, both oral and documentary, submitting portions of its records as part of the res gestae.

The Government has not offered evidence of any expressed undertaking to restrain interstate trade or to create a monopoly. It insists, however, that the policies and practices of the allied corporations and their officers from the year 1925 until the time the information was filed have remained constant, namely, lower buying prices for A & P than those of its competitors, realized largely through discriminatory preferences to A & P from suppliers, enabling A & P to undersell retail competitors and to off-set losses incurred in selected areas at a profit rate below cost of operation. It complains, not of the size of the defendants' enterprise but that, through vertical and horizontal integration

[1] In using the word defendants generally I shall include all defendants named in the information, except Robert B. Smith, who is now deceased.

reflected by the evidence, defendants have acquired and used tremendous power in such manner and employed such means as inherently involve unreasonable restraint of competition. It insists that A & P, in meeting competition in certain sections has so lowered prices as to result in stores in those sections being operated at a loss; that, to reimburse them for losses or lessened profits, stores have received allotments of other earnings which are first received at headquarters and then allocated to the stores; that these include, not only earnings of the wholly owned subsidiaries but also stock gains, advertising allowances received from suppliers and various other "headquarters" profits, and contribute to an illegal result, i.e., they bar or handicap open competition; and that in certain sections, defendants have agreed with others to fix prices. It insists that there is adequate proof of illegal action by Atlantic Commission Company in that it acts as buying agent for A & P and at the same time as broker for vendors selling to other distributors and as buying broker for others and eventually turns over all its profits to A & P. It insists that defendants have engaged in false front activities, the nature of which I shall discuss hereafter. In short, it is the Government's position that it has proved beyond reasonable doubt that all of the actions of defendants disclosed by the evidence in the end amount inevitably to illegal restraint of trade as charged in the first count and to an attempt to create a partial monopoly as charged in the second count, while defendants insist that proper analysis of the evidence can lead only to a conviction that they never at any time intended to violate the law; that their recorded policy over a period of years has been to live within the law, and that they have studiously attempted at all times to meet competition fairly, without threat to its healthy open existence, all in order to achieve their only purpose—to furnish the consuming public with good goods at cheap prices and a low profit.

It is obvious, therefore, that determination of which is the correct view, or a reconciliation of one with the other, involves the issue of whether the evidence points inevitably, beyond all reasonable doubt, to guilt, or whether it discloses such facts as are consistent only with innocence. In order to answer satisfactorily to myself the resulting collateral questions, it has been necessary to give careful attention to a vast amount of evidence and, as the question to be solved has frequently been, from the viewpoint of each of the parties, one of determination of inevitable implications of largely undisputed facts, I have found it essential to scrutinize many minutes, resolutions, contracts, letters and other documents. To attempt to summarize the evidence fully and accurately would extend this memorandum to an unreasonable length. I shall attempt only to point out some representative or typical features in the hope that my complete consideration will be reflected by what I say.

### Historical Development and Present Status of A & P.

A & P, as a genus, came into existence some 75 years ago. Defendants John A. and George L. Hartford, sons of one of the original founders, George H. Hartford, connected with the enterprise since early manhood, control the corporations forming the group, through the George H. Hartford trust, of which they are trustees. The group first operated only "economy stores," run by one man, with no deliveries, no credit, no advertising and no telephones; later it opened various "combination stores," carrying meats and vegetables as well as groceries, "special development stores," and still later "supermarkets." In 1920 there were 4,638 A & P stores in the United States, with sales of $235,303,000 and earnings, before taxes, of $4,806,000. At the end of 1924, there were 11,413 stores, sales of $352,093,000, and earnings of $13,165,000. In 1925 occurred what the Government terms a reorganization and the defense a decentralization, under which all territory in which A & P operated was divided into divisions, of which, since 1938, there have been seven as charged in the information. On June 1, 1926, sales aggregated some 26.6% of the total U. S. Food business done by all chain stores, which, as a group, were doing 23.6% of the total grocery business of the United States. At that time A & P had 14,220 stores out of a total of all chain stores of 46,800.

632

The controlling stock of the New York corporation is owned by the two Hartfords as trustees and that of the Maryland corporation by the New York corporation. The Maryland corporation owns the controlling stock of all other subsidiaries except the Great Atlantic & Pacific Tea Company of Vermont, Inc., which is owned by the New Jersey corporation, a subsidiary of the Maryland corporation. The relative positions of the executive officers is stipulated as hereinbefore set forth.

The New York corporation does not handle merchandise. The Maryland corporation helps finance the operating companies—its subsidiaries or subsidiaries of its subsidiaries. The New Jersey corporation operates retail food stores in 24 states, the Arizona in thirteen states, other than those in which New Jersey operates, and Nevada in three states, in, addition to those in which New Jersey and Arizona operate. The Delaware corporation does not buy, manufacture or sell food products, but seems to have been created for the purpose of protecting the company's name in states where A & P is not yet doing business. The Vermont corporation merely conducts liquor departments in the retail stores operated by the New Jersey corporation in the state of Vermont. Quaker Maid Company, Inc., maintains four manufacturing plants and ships its products to A & P warehouses, packed under A & P labels. The American Coffee Corporation buys green coffee in South America from producers and on the spot market which it sells to the New Jersey corporation at the ports of export and which is then imported and turned over to the national coffee department, roasted and distributed under A & P labels. The White House Milk Company, Inc., operates plants in Wisconsin, selling and shipping its products to the warehouses under A & P brands. The Nakat Packing Corporation packs and cans in four canneries in Alaska salmon which is sold and shipped to A & P warehouses. The Atlantic Commission Company, Inc., is qualified to do business in 36 states. It is commonly referred to as Acco and will be so designated here. Organized primarily to purchase fresh fruits and vegetables for A & P, it purchases from growers and shippers in the various producing parts of the country produce which it delivers to A & P warehouses and stores. By 1940 approximately 70 per cent of the merchandise purchased by Acco was shipped to A & P and about 30 per cent sold to competing trade, from which is derived profits in the form of brokerage. The Government claims that its chief purpose was to procure for A & P select quality at special prices and to divert relatively low quality produce to the outside trade at higher prices. Previous to passage of the Robinson Patman Act and the court decision enforcing it against A & P in 1940, Acco enjoyed substantial profits from brokerage collected from suppliers on products purchased for A & P.

The mechanical set-up and business methods of all divisions seem to have been substantially the same, with perhaps the exception of the eastern, which operates entirely in metropolitan New York more nearly as a unit than the other divisions, in which diverse units are located, frequently widely separated. Divisions are not incorporated, but each has a president, one or more vice presidents, a treasurer, secretary, director of sales, director of purchases and director of operation. Each has, also, an advisory board of directors, of which the officers are members, and an executive committee, which meets frequently to decide questions of current nature which can not wait for a full board meeting. Each division is subdivided into units, in each of which are located retail stores and, in most instances, warehouses which serve the stores. The units are not incorporated but each of them, too, has officers, including the general superintendent, who is often a vice president of the division, office manager, sales manager, unit buyer and warehouse superintendent, all of whom jointly constitute the unit executive committee. Supervisors, working under the general superintendents, visit, check and report upon the stores in the unit. Each store has a manager.

Since 1925 the presidents of the divisions, together with the Hartfords, and Bofinger and others, have constituted the general policy-making body. They meet quarterly at headquarters in what they term presidents meetings. Usually present have been the two Hartfords, until his death, R. E.

Smith, vice president, Burger, secretary, Bofinger, vice president in charge of purchases and chairman of the merchandising committee, the division presidents and representatives of the national accounting and statistical departments and various other employees. All attending vote upon matters presented. Also meeting at headquarters are the merchandising committee, the sales directors, the purchasing directors and the comptrollers. At presidents meetings open discussion prevails, but it is obvious from the many records submitted that the voice of the Hartfords is a valued guide, indeed, the determining factor in deciding what is to be done. Any attendant may express his opinion but, in the end, I think it clear, the wishes of the two joint heads of the group constitute at all times the controlling factor in determination of policies for the entire A & P set-up.

By 1942 A & P retails sales had expanded to $1,444,718,000. In 1941 principal chain stores figures were: A & P $1,354,018,000; Safeway $475,125,000; Kroger $302,766,000; American Stores $157,677,000; First National Stores $121,949,000; National Tea $72,182,000. For the year 1930, eleven years earlier, the sales were: A & P $1,059,099,000; Kroger $257,094,000; American Stores $142,770,000; National Tea $85,236,000. The number of A & P stores advanced from 4,588 in 1920, to 15,422 in 1930 and then declined to 5,821 in 1942 and 5,751 in 1943, principally because of replacement of smaller service stores with supermarkets, where volumes handled are much greater. Thus the tons per store increased from 2.73 tons per week in 1925 to 6.40 tons in 1937. The average dollar weekly sales per store rose from $678 per week to $1,175. A & P total tonnage in 1941 had become 7,200,000 tons, an average weekly per store of approximately 19 tons. In 1941 the average weekly sales for all stores was $4,662, for all supermarkets $12,128 and for all special development stores $5,753.

The defense introduced a chart disclosing the comparative amounts of national food sales over a period of years compiled from Department of Commerce statistics. This shows that in 1933, of the total sales of stores engaged primarily only in sale of food at retail, independent sales amounted to 61.7% of the total, those of all chain stores to 38.3% and those of A & P to 11.6% and that in 1943 the sales of the independent stores constituted 70.2% of the total, those of all food chains, 29.8%, those of food chain stores other than A & P 22.7% and those of A & P 7.1%.

The Government contends that any persuasive effect of the figures shown is completely negatived upon proper analysis; that nation-wide comparisons do not take into consideration expansion in territories occupied by A & P. It deduces from the record, that in 1925–1926 A & P had some 33 units, that of these, one unit only had more than 15% of the total available business in its territory, eleven units from 10 to 15%, twelve from 5 to 10% and nine less than 5%; whereas in 1941 A & P had 39 units with the following percentages of the total available business in the respective communities; eight with from 15 to 20%; eighteen 10 to 15%; ten 5 to 10% and three less than 5%. It insists that A & P's percentage of total available business in the areas occupied by A & P is shown to be much larger when limited to cities of certain sizes within the divisions. It refers to the board of directors meeting of the central division in May, 1941, when a program of supermarkets and special development stores was outlined aiming at obtaining 20% of the available food business in cities where there was an available volume of $20,000 or more per week. That record discloses that at that time A & P had more than 20% of the total available business in approximately three fourths of the cities in the division. There were in the division eight cities where A & P had over 50% of the available business, 15 cities from 40 to 50%, 51 from 30 to 40%, 51 from 20 to 30%, 55 from 10 to 20%, seven with less than 10%. In short the Government contends that the chart is wholly valueless in determining A & P's true growth in that it does not reflect development in areas actually occupied by A & P but is built upon a national basis, which is misleading, inasmuch as A & P does not participate in business in all communities.

The sales of Quaker Maid, White House Milk, Nakat, Fish Department, Tea, etc., expanded from a total of $41,960,000 in

1931 to $88,720,000 in 1941. In 1941 the bakery sales, as compared with the well known national bakers, were as follows: A & P $55,077,000; Continental $69,427,000; General $42,067,000; Purity $41,414,000; Ward $36,721,000. A & P increased sales of its own coffee from 60,928,000 pounds in 1925 to 270,503,757 in 1941 and those of outside brands from 1,972,251 pounds in 1925 to 28,817,109 pounds. An increase of 43% in A & P brands of coffee in 1940 over 1930 compares with a national increase in coffee sales of 18%. This latter fact, says the Government, further proves the undependability of comparisons of A & P statistics with national statistics. The Government's calculation is that, after taking into consideration the coffee consumed in hotels, restaurants, etc., and the fact that A & P covered only 78% of the population, its coffee sales were equivalent to 20% of the available retail business. Purchases of soap in 1937 were $4,997,355 and in 1941 $9,529,633. The national meat department of A & P purchased 685,770,383 pounds in 1940. This represented an increase of 36.6% over 1939. Acco handled in 1938, 8.41% of the total national movement of fresh fruits and produce; in 1940 11.62%. Total sales of Acco for the fiscal years 1940 and 1941 were $79,294,969 and $103,503,250. Of this, in 1940, $6,490,146 represented sales to the outside trade.

John Hartford testified that the division presidents hold their positions at the will of himself and his brother, and I believe it the only proper inference that this is true as to all officials of the various corporations, resulting, for all substantial purposes, in unification of ownership and of control in the two Hartfords. The board of directors of the New Jersey corporation pass upon and approve the appointment of division presidents and approve or ratify the actions of the presidents meetings. The various officers of the corporations have at all times recognized this unification; so Parr, in charge of field buying said: "it is all the A & P Tea Company to me." Burger did not know which corporation handled the merchandising. The officials and employees quite generally do not distinguish one corporation from another. They recognize John Hartford as presi-

dent, George Hartford as chairman of the board and treasurer and Burger as assistant to John Hartford. Everyone seems to have considered the total operation of the A & P group as the operation of one company; all net earnings eventually reached the two Hartfords.

Mr. Hartford stated to the presidents in 1937 that responsibility for determining programs rests in headquarters; that the presidents meetings control the conduct of the business, although carrying out details is left to division key man and the headquarters buying committee. He cautioned the conference to make sure that company policies were carried down to the employees of the system. Minutes of meetings are sent to unit heads and thereafter the boards of directors of the divisions attempt to carry out the enunciated policies. One president testified that occasionally decisions were made at the presidents meetings not in accord with the views of the two Hartfords but, upon cross-examination, he failed to recall any instance of such action. Operation of manufacturing plants and expansion programs are likewise controlled by decisions of the presidents meetings. Compliance by the operating organization with company policy is checked by reports of the auditing department. Any violation of policies must be reported to headquarters. Employees of subsidiaries receive stenciled copies from the New York office which serve as statements of policies approved by headquarters.

The merchandising committee at headquarters coordinates the general advertising for and merchandising of retail operations, including subsidiary manufactured products and their competing nationally and sectionally known brands. Bofinger, in charge of buying operations, was chairman of the committee, which included the general manager of Acco, public relations counsel, representatives of Quaker Maid and American Coffee, advertising counsel, Connors, in charge of the meat department, Gundry, assistant to Bofinger, Gilb, head of the national bakeries division and Kling of White House Milk and Nakat Packing corporations. This committee does not fix policies but interprets and carries out those prescribed at the presi-

dents meetings. It helps guide the retail organizations in handling A & P's own products and those purchased from outside manufacturers, supervises the advertising activities, acts as headquarters sales department and recommends policies to the presidents meetings. In addition, there are meetings of the directors of purchases of the divisions and the divisional directors of sales, under, apparently, the directing hand of Bofinger, who is also head of the grocery department at headquarters, which, in turn, directs the activities of the purchasing directors. These meetings, too, are attended, at least at times, by the two Hartfords, Bofinger and the headquarters buyers and by assistants to Bofinger. The division sales directors meetings are attended by sales directors of the divisions and headquarters representatives and concern themselves with national sales programs.

The complete buying organization consists of the headquarters purchasing department, field buying offices, purchasing directors for each division and unit buyers for the respective units. Bofinger, head of the first of these, has some ten or twelve assistants, each of whom has to do with one particular group of products. Purchases are also executed by field buyers and division purchasing directors. The latter are accountable to headquarters and the unit buyers to the divisional purchasing directors. The purchasing director for each division purchases goods produced within the division and goods produced outside the division but sold by the manufacturer only within the division. The same rule is applicable to unit buyers. If a manufacturer desires to sell more than one division, he must deal with headquarters or one of the field buying offices.

Some 75% of the fruits and vegetables purchased for A & P are purchased by Acco. The remainder consists of small purchases made by store managers from local producers and other purchases made by the units to fill in or supplement other purchases. National purchases are made by the egg and poultry department at headquarters. The purchasing department buys produce not only for the retail stores but also for the manufacturing system. New commodities are not stocked generally without permission of division headquarters. If they are competitive with products manufactured by A & P subsidiaries, the retail stores must first make an effort to have the A & P products take care of the demand.

The Government presents an analysis of profits. There is some controversy as to the correctness of the figures presented, but I deem them sufficiently truly illustrative of the facts. The total profits of A & P in 1939 were $21,312,000, in 1940 $23,409,000, in 1941 $26,025,000. Of these the net retail profit in 1939 was 6.31% of the total, in 1940 9.37% and in 1941, 10.98%. In the same years the manufacturing subsidiaries' profits were, in 1939 $5,009,067 or 23.50% of the total; in 1940 $5,310,890 or 22.69% of the total and in 1941 $6,359,012 or 24.43%. The earnings in coffee were, in 1939, $3,092,760 or 14.51% of the total, in 1940 almost $4,000,000 or 16.80%, in 1941 $3,274,348 or 12.59%. Thus it is evident that the profits from coffee alone in each of the three years was in excess of those from retail earnings of all of the several thousand retail stores.

The headquarters' allocation of profits exceeded the net profit of the retail stores in 1939, being more than three times as much as retail earnings, and in 1940 and 1941 more than two times as much. The manufacturing companies' earnings in 1939 were more than three times net retail earnings and in 1940 and 1941 more than two times. The earnings of Acco alone very closely approached the total retail earnings of all the stores. In 1939 its profits were $1,082,336 or 5.08% as compared to 6.31% for net retail profits; in 1940 $1,-316,374 or 5.62% of all profits as compared with 9.37% for the net profit of the retail stores and in 1941 profits of Acco were $1,863,697 or 7.16% of the total profits as compared with 10.98% for net retail profits from the stores. It thus appears that if the retail stores of the A & P system had operated without any profit, the net earnings from all other sources would have equaled in 1939, 93.69% of what was realized including retail profits, in 1940, 90.63% and in 1941, 89.02%.

Before discussing further details of evidence, I shall refer briefly to certain

pertinent decisions. The purpose of the Sherman Act is to prevent restraints of interstate commerce, to maintain its appropriate freedom in the public interest, to afford protection from the subversive or coercive influence of monopolistic endeavor. As a charter of freedom, the Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions. It does not go into detailed definitions which might either work injury to legitimate enterprise or through particularization defeat its purposes by providing loopholes for escape.

"Combination which unreasonably limits competition which would otherwise exist between persons in similar businesses is illegal. A suppression of competition necessarily restrains commerce. Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683, Ann.Cas.1918D, 1207. * * * In Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 45, 75 L.Ed. 145, it was said: 'In order to establish violation of the Sherman Anti-Trust Act, it is not necessary to show that the challenged arrangement suppresses all competition between the parties * * *. The interest of the public in the preservation of competition is the primary consideration.' The restraint of trade contemplated by the statute means restraint of competition. United States v. Eastern States Retail L. D. Ass'n, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788." William Goldman Theatres, Inc. v. Loew's, Inc., 3 Cir., 150 F.2d 738, 743.

The court said further:

"The statutory prohibition is against any course of conduct which monopolizes 'any part' of interstate trade. We know of no authority which sanctions what would otherwise be an illegal monopoly simply because it operates in a single city or a particular part of a city and affects only a part of an industry involved. There is no such limitation on the effect of the anti-trust laws. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; Indiana Farmer's Guide Pub. Co. v.

Prairie F. P. Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356; Oxford Varnish Corp. v. Ault & Wiborg Corp., 6 Cir., 83 F.2d 764; Peto v. Howell, 7 Cir., 101 F.2d 353; Truck Drivers' Local No. 421 v. United States, 8 Cir., 128 F.2d 227; White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 129 F.2d 600; Louisiana Farmers' Protective Union v. Great A & P Tea Co., 8 Cir., 131 F.2d 419; Bigelow v. Calumet & Hecla Mining Co., C.C.Mich., 167 F. 704."

■ Combination that leads directly to lower prices to the consumer may, even as against the consumer, be restraint of trade; and combination that leads directly to higher prices may, as against the producer, be restraint of trade. The statute, thus interpreted, has no concern with prices, but looks solely to competition, and to the giving of competition full play, by making illegal any effort at restriction upon competition. Whatever combination has the direct and necessary effect of restricting competition is, within the meaning of the act as now interpreted, restraint of trade. United States v. Swift & Co., C.C.Ill., 122 F. 529. In United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035, the court said (page 388 of 262 U.S., 43 S.Ct. 611, 67 L.Ed. 1035):

"The Sherman Act was intended to secure equality of opportunity, and to protect the public against evils commonly incident to monopolies, and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition—the play of the contending forces ordinarily engendered by an honest desire for gain."

"Nor is it determinative in considering the policy of the Sherman Act that petitioners may not yet have achieved a complete monopoly. For 'it is sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition.'" Fashion Guild v. Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 707, 85 L.Ed. 949; United States v. E. C. Knight Co., 156 U.S. 1, 16, 15 S.Ct. 249, 39 L.Ed. 325; Addyson Pipe & Steel Co. v. United States, 175 U.S. 211, 237, 20 S.Ct. 96, 44 L. Ed. 136.

In American Tobacco Company v. United States, 66 S.Ct. 1125, 1139, the court said: "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. * * * The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. * * * Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act. * * * A combination may be one in restraint of interstate trade or commerce or to monopolize a part of such trade or commerce in violation of the Sherman Act, although such restraint or monopoly may not have been actually attempted to any harmful extent. See United States v. International Harvester Co., D. C., 214 F. 987; Id., 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302. * * * the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition. * * * It is not necessary that the power thus obtained should be exercised. Its existence is sufficient."

■ "With respect to defendant's purposes, we find no warrant for determining that they were other than those they declared. Good intentions will not save a plan otherwise objectionable, but knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences." Appalachian Coals Inc. v. United States, 288 U.S. 344 at 372, 53 S.Ct. 471, 478, 77 L.Ed. 825. The inquiry must be whether, despite the objective of good intentions, the inherent nature of the plan was such as to create an undue restraint upon interstate commerce. Appalachian Coals Inc. v. United States, 288 U.S. 344 at 372, 53 S.Ct. 471, 77 L.Ed. 825.

In Wardell v. Union Pacific R. Co., 103 U.S. 651, 26 L.Ed. 509, discussing fiduciary relationship, the court said: "the same person cannot act for himself and at the same time, with respect to the same matter, as the agent for another, whose interests are conflicting. Thus a person cannot be a purchaser of property and at the same time the agent of the vendor. The two positions impose different obligations, and their union would at once raise a conflict between interest and duty; and, 'Constituted as humanity is, in the majority of cases duty would be overborne in the struggle.' Marsh v. Whitmore, 21 Wall. 178, 22 L.Ed. 482. The law, therefore, will always condemn the transactions of a party on his own behalf when, in respect to the matter concerned, he is the agent of others, and will relieve against them whenever their enforcement is seasonably resisted. * * * all persons who stand in a fiduciary relation to other parties and are clothed with power to act for them are subject to this rule; they are not permitted to occupy a position which will conflict with the interest of parties they represent and are bound to protect. They cannot, as agents or trustees, enter into or authorize contracts on behalf of those for whom they are appointed to act, and then personally participate in the benefits."

■ All who participate in a Sherman Act violation, or who aid or abet in its commission are indictable as principals. United States v. MacAndrews & Forbes Co., C. C. N.Y., 149 F. 823. Individual defendants who have cognizance of and participate in carrying out policies and practices inherently involving unreasonable restraint of trade or monopoly are criminally liable for the acts and practices of their superiors or their employees although they may not have specific knowledge of each act done or know all the details of the carrying into effect of such policies and practices. An individual is criminally liable if he actually participates in an unlawful act, or if he authorizes another to participate in an unlawful act, or if he ratifies the unlawful act of another after knowledge of it. United States v. Winslow, D. C., 195 F. 578, af-

firmed 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481; United States v. Lancaster, C. C. Ga., 44 F. 896, 10 L.R.A. 333; McGrath **v.** Mathues, D. C., 6 F.2d 149; Lawlor **v.** Loewe, 2 Cir., 209 F. 721, affirmed 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341.

■ The acts of a corporation's governing officials, when they act on behalf of the corporation and within the scope of the general powers delegated to them, including acts which such officials assume to do while performing duties actually delegated, are properly attributable to the corporation for criminal purposes. New York Central R. R. Co. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613.

### Defendants' Buying Practices.

The Government finds nothing inherently wrong in defendants' intercorporate integration but contends that by means of horizontal integration, that is, combination under one management of a number of similar industries on the same level, and vertical integration, that is, combination under one management of different business functions at more than one level, both of which have existed since 1925, defendants have so acted as, inherently, by their misuse of such integrated power, unreasonably to restrain interstate trade. For example, says the Government, in 1925 A & P received $624,560.97 in profits from the American Coffee Corporation and exhibited an intent to dominate the coffee business in these words: "Desire to see A & P gain and retain a supremacy in coffee * * * with a holeproof organization from tree to cup, we shall have nothing to fear from future competition." The Government also refers to the fact that in 1934, profits of the central division were reduced from $1,300,000 for the first quarter of 1933 to $700,000 for the first quarter of 1934, in order to permit the division, and particularly the two Pittsburgh units, to pursue an aggressive sales policy. The earnings referred to include profits from source outside of retail sales, such as advertising allowances and income of subsidiary companies. It was said: "this unique advantage of the company over competitors should be explored to the limit." This is one of many such instances which, the Government claims, illustrate abuse of vertical and horizontal integration with ruinous effects on competition.

The Government claims that defendants have forced preferences unavailable to competitors by threats to withhold or withdraw purchases and to engage in manufacture of competing products on their own account, thereby creating unreasonable restraint of food processing and distribution; that crediting profits realized from manufacture and other nonretail sources to A & P's income so operates as to subsidize wrongfully its retail operations and that Acco's inconsistent roles bring to A & P profits which in turn work an illegal advantage in it over competitors.

Whether defendants would manufacture products in any instance was quite naturally based upon whether A & P could obtain such prices from suppliers as would make it imprudent, as a business proposition, to engage in manufacturing itself. As early as 1927, at the request of John Hartford for an expression on pushing A & P's own brands, the minutes recite that the time has arrived for making a "demonstration in order to safeguard the arrangements which we now have with national manufacturers. * * * national manufacturers * * * will be anxious to keep their arrangements with us attractive so that we would not consider it necessary to go into their lines. * * * coffee would be the best commodity to start out with and White House Milk next." The Government submitted evidence of certain events in this respect, some of them occurring many years ago, including defendants' action in New Orleans in rice, shrimp and canned oysters, their dealings with Campbell as to beans and spaghetti in 1925, when Hartford suggested that A & P could afford to cease to make those products, inasmuch as it could resume its own manufacture, if Campbell's terms should prove unsatisfactory, and A & P's decision to continue to manufacture gelatin products until it could consummate a satisfactory arrangement with the Jello Company. In March, 1927, Canada Dry had withdrawn from sales to A & P because of the latter's alleged price cuts in Indianapolis. John Hartford said that an organization with 15,000 stores was too big to be dictated to, and A & P decided to select

one of its own competing products, advertise it extensively and price it attractively, to demonstrate that it could establish a competing product. Canada Dry returned to the A & P fold and it was announced in 1928 that A & P's emphasis on its private brand had achieved its purpose.

In 1939 A & P sought to secure from large soap companies allowances on Crisco and Spry shortening so that A & P could profit by ordering in straight carload lots. The manufacturers rejected the suggestion and A & P advised its buyer that when A & P got ready to go into the shortening business the retail price would be made very attractive as compared with that of Spry or Crisco and that thereby A & P would be able to secure greater concessions than it then could and that, consequently, the soap manufacturers should not, at that time, be pushed.

In February, 1926 it was decided that more favorable relationship with the great millers could be established by purchasing A & P's entire requirement of flour on an allowance basis through one source, "thereby taking advantage of our buying power."

The national meat department, in Chicago, under the management of Conners, made carload purchases from western packers for the entire system. Headquarters advised that it was to A & P's interest to "exercise our buying power" through the Chicago purchasing office. In 1940 Conners was given complete authority over all meat purchases.

The effect of correspondence with Ralston Purina Company was that A & P would have to have a lower price for corn flakes or it would enter into manufacture of cereal itself. A & P had considered opening a plant in the corn belt, obtained cost quotations and had made a survey, all of which indicated that it could manufacture flakes with a saving of 21¢ per case on the price it was then paying Ralston. Ralston finally offered an additional allowance of 10¢ per case or a total of 17½¢ and A & P did not build its plant. Defendants explain this alleged duress of Ralston Purina Company as in no wise coercive, but as merely a definite statement on the part of A & P that it was "paying too high a price to Ralston and that, if it could not obtain a better rate, it would go into business," all with the intent to secure a fair sales price, rather than to force the supplier to sell goods at A & P's dictated price. Defendants point to the comparatively small portion of Ralston's business which went to A & P, as "proof in support of our contention."

The Government suggests that concentration of purchases of salmon resulted in price preference to A & P of from 5 to 10¢ per case. Other instances of the alleged misuse of A & P's buying power are cited but the ones discussed are illustrative.

Defendants admit that they have been aggressive in carrying out their merchandising policies but deny that A & P ever attempted to manipulate its power in order to realize an unwarranted discrimination or preference. They refer to Parr's language to the effect that "there should be no tactics employed which would even hint of being coercive," and to that of Hensley in 1940, stating that no pressure was to be brought to bear other than a mere statement of A & P's policy and to counsel's letter of October 28, 1936.

### Retail Operations.

The Government contends that A & P used its wide-flung horizontal integration to maintain leadership in retail business by supplementing unduly reduced retail prices in competition by subsidies or profits from sources other than retails, and offset losses incurred in selected areas, because of fixed low prices or low gross profit rates in order to force volume, by profits from other localities, or by diversion of headquarters profits to retail stores; that retail price leadership was sought and maintained for the purpose of injuring retail competitors and that the methods employed were such as inherently to injure nonintegrated retail competitors. It contends that A & P insisted, in all situations, that its prices be kept as low as, or lower than, prices of its competitors and that, inasmuch as increased sales of subsidiary products meant more money to A & P with which to reduce gross profits, on products which were available to competitors, it thus made it, as defendants said, "very hard for the average supermarket to compete with us." It claims that in A & P's desire to attain a

position which would make it possible for it to sell food more cheaply than any competitor, it undersold others but refused to be undersold and that competitors suffered, citing instances in various divisions. This program the Government says, by 1941 had placed A & P in a position to fix its operation at a gross profit rate impregnable to competition. An A & P sales director did say that competition as it was known in the old days "does not exist today"; that "there is no one in the industry selling food at a markup as low as ours." John Hartford said that profit rates should be held at a level whereby the business would be in an "impregnable position against competitive supermarket invasion." Defendants used this language: "when it comes right down to brass tacks we have no competition from a price point of view." Sales of meat were frequently "at substantial loss." John Hartford said early in 1942 that headquarters desired a .0022 retail operating profit; that subsidiary profits and headquarters' allowances would take care of the rest; that this was excellent for the company and that every one should be interested in seeing "that this situation be perpetuated."

Selling Practices. Profit Rates.

The Government presents a prolonged discussion of defendants' suggested profit rates. It is perfectly obvious, as defendants point out, that these were merely programs, but equally obvious that they were goals which defendants expected divisions to strive to attain. The Government construes expansion under low gross profit rates as intentionally building up volume at the expense of competition, relying upon evidence that below average low gross profit rates were fixed in certain territories where competition was severe until competition had been overcome.

From 1929 to 1936, A & P programs for net profit rates ranged from .0271 in the middle western division to .0382 in the eastern division. Central western division was directed to operate on a net profit basis of 1½ to 2%, including nonretail profits. If results were satisfactory, Hartford believed, the plan should apply to all divisions. The division was authorized to "plough back into Cincinnati whatever is necessary in the way of a drastic sales campaign" in order to bring the unit up to par with the rest of the division. A & P's percentage of available business in Cincinnati was 5% while that in the entire division was 9%, including Grand Rapids with 14% and Detroit with 10%. Appropriations of $52,000 for Louisville and $14,950 for Cincinnati were approved in order to help them continue low gross profit rates. At the same time, the southern division was earning 34¼% of the company's retail profits with only 23¼% of the company's investment. Pittsburgh placed more than 100 stores in a special BB zone in which special low prices prevailed and some stores operated at a loss.

In opening supermarkets, the gross profit rate, Mr. Hartford directed, should not exceed 10%, though the company's average supermarket expense rate then was 11.97%. He said "establish them on a low gross profit and maintain them on this basis until we feel that their security has been definitely fixed." In this program to gain additional volume, some supermarkets lost money. In the central division, the organization was advised not to be concerned about losses and that supermarkets should continue to work on a low rate and brought to a higher volume. The middle western division, in November 1938, was informed that it should reduce gross profit rates wherever volume had not materialized, regardless of expense rate.

The New England and Atlantic divisions were in an unfavorable position, the losses being $15,000 per week in New England, and $11,000 per week in, Atlantic. New England division lost $252,665 on sales in 1939 and Atlantic $288,752. It was A & P's plan to earn $7 per share on its stock out of all operations including retail sales, headquarters' and subsidiaries' earnings. In order to do this, it was suggested that the five divisions other than New England and Atlantic should earn $5,750,000. In 1940 over 75% of the system's profits came from subsidiaries and advertising allowances. Oklahoma City had deficits for three years, Kansas City for four years and Cincinnati, Seattle and Los Angeles for varying periods.

It is the Government's contention that the evidence discloses a plan to obtain, in the communities in which A & P operated, 25% of the available business. I shall content myself with saying that I think it clear that the amount of available business in any given area was the starting point on which A & P's activity in that territory was planned and that, in many instances, it was A & P's definite program that its supermarket merchandising should eventually enjoy 25% of the available business. I think it clear, too, that, attempting to reach this goal, reduction of gross profit rates was continuously made in various places and subsidiary profit consistently used to supplement the earnings; that the system's overall annual programs under each goal set by headquarters inherently contemplated subsidization of retail operations generally and of retail operations in areas with unsatisfactory volume in particular by profit from other sources. Inevitably reduction in gross rates lowered the profits from retail sales while nonretail profits increased by virtue of the large volume of A & P's products, resulting in A & P being able to sell merchandise cheaper than competitors. Retail profits became a minor matter. Mr. Hartford said "when we open * * * a new territory, * * * generally the new unit operates at a loss." Periodically comparisons were made of A & P's volume in any area with that of its chief competitor, for the purpose, as the Government says, to determine the extent of aggressiveness which A & P should exercise in achieving or maintaining supremacy in the territory. Growth by a competitor at a more rapid rate than A & P was considered "a direct challenge to our (A & P's) ability, and something must be done to change" that trend. John Hartford testified "we had a pattern * * * if we could get a certain volume * * * we should have a certain expense rate, that would allow us to make a certain gross. If we did not get that, we were just out of luck." And he added "we would not change our prices to bring a store into black ink." The Government contends that the evidence rebuts any favorable inference from Mr. Hartford's statement that the company did not anticipate a loss in selected areas. It argues that the express recorded assignment of definite operating losses in the programs for selected areas could not have been effective without anticipating losses and that A & P's aim of ultimate profit did not justify the means used to achieve that end.

Defendants insist that the evidence reflects no concerted plan to select areas for special treatment for the purpose of injuring competition, i. e., for the purpose of injuring or destroying competitors by cutting prices in one area lower than those elsewhere until control of the retail business in that area has been obtained and offsetting the losses or reduction in profit from such price lowering by the use of income from other areas and from nonretail operations. They offered evidence to show that the primary reason why stores lost money was not low prices but poor management, lack of volume and other factors having nothing to do with prices and that, although there were some losing supermarkets, the majority of losing stores were the small regular stores, and that the prices in these were higher than in the supermarkets. They argue that the fact that every unit always had a number of red stores makes it unrealistic to conclude that "selected areas" were thrown into the red systematically for the purpose of "destroying competition"; and insist that the record shows that there was strong competition wherever A & P operated and that there is no evidence that A & P unreasonably interfered with competition or obtained a monopoly anywhere. At Springfield, Missouri, defendants insist, A & P failed to succeed and closed its store because of the competition of Safeway. They point to other instances where A & P failed to succeed and closed stores. Since 1933 A & P has withdrawn from over 1,000 towns and has opened in only 140 new towns. They argue that there is no instance where A & P drove any competitor out of business and that the evidence of competitors' store openings and closings proves nothing. They admit that, in determining the overall profit of A & P, the profit and loss account was made up by placing in it all income and deducting from it all expenses, including income and expense of losing as well as successful stores. To this extent,

642

they agree income from profitable stores offset the losses from unsuccessful stores. But, they aver, this is one of the incidents of any business operating more than one unit.

The Government concedes that A & P may lawfully employ subsidiary manufacturing operations. Defendants insist that if that is true, it forecloses any objection to A & P's manner of distributing its manufacturing profits. They assert that since 1934 the produce manufactured by defendants has been billed at market prices which has usually resulted in manufacturing profit; that manufacturing profits or losses are paid as dividends to the parent corporation, which makes no accounting distribution of them to divisions or units. A statistical allocation is made to the several units, but, defendants insist that "according to the testimony in this case, it does not in any way favor an unsuccessful or unprofitable store or a store whose prices may be lower than 'elsewhere' and no violation of the Sherman Act can be spelled out of the allocation of A & P's subsidiary profits or losses."

Integration, whether vertical or horizontal or both, is not per se unlawful. So the Government here must show that the size of A & P, its integration, both vertical and horizontal, its resulting power in the industry, were so employed as to bring about inevitably unreasonable advantages over competitors not similarly integrated. The charge is that defendants have so utilized their power and integration as unreasonably to restrain commerce. This means more than meeting competition, more than price cutting, more than coming to prices on even terms with competitors. It means that in their integrated industrial effort, defendants must have overstepped the line by injecting into their competitive methods and into their integrated competitive power, illegal factors of such importance as to taint the entire operation.

I am not concerned with any question as to the wisdom or lack of wisdom of the policy of A & P or any other chain store organization but am confronted with the question whether A & P's methods, even though they look to a legitimate end, have in them an inherent factor of such legal malevolence as to taint the operation. Dealers have the right to sell freely without restraint. Have defendants unreasonably crippled that right? Such is our real question. Defendants have the right to set prices at such figures as to meet competition. It is only when price cutting extends to destruction or unreasonable restraint of competition or taking losses in order to attain an ultimate monopoly or partial monopoly that the law is violated. If the methods employed are such as necessarily to employ a factor which reflects inevitably an intent to injure or destroy competition, we have something illegal. The Government must prove either that there was a specific wrongful intent to effect restraint of trade or that the acts of defendants had the inherent tendency necessarily unreasonably to restrain trade. As Mr. Justice Lurton said (United States v. Reading Co., 226 U.S. 324, 33 S.Ct. 90, 103, 57 L. Ed. 243): "Whether a particular act, contract, or agreement was a reasonable and normal method in furtherance of trade and commerce may, in doubtful cases, turn upon the intent to be inferred from the extent of the control thereby secured over the commerce affected, as well as by the method which was used. Of course, if the necessary result is materially to restrain trade between the states, the intent with which the thing was done is of no consequence." See also Industrial Assn. of San Francisco v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849; Hopkins v. United States, 171 U.S. 578, 19 S.Ct. 40, 43 L.Ed. 290; Anderson v. United States, 171 U.S. 604, 19 S. Ct. 50, 43 L.Ed. 300.

The Anti-Trust Act was not intended to prevent normal expansion of business. It offers no objection to the mere size of a corporation, or to the continued exertion of its lawful power, when that size and power have been obtained by lawful means and developed by natural growth, although its resources, capital and strength may give to such corporation a dominating place in the business and industry with which it is concerned. It is entitled to maintain its size and the power that legitimately goes with it, provided no law has been transgressed in obtaining it. United States v. U. S. Steel Corp., 251 U.

S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; United States v. International Harvester Co., 274 U.S. 693, 708, 47 S.Ct. 748, 71 L.Ed. 1302; Appalachian Coals v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825. Only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade. United States v. U. S. Steel Corp., 251 U. S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121.

### Stock Gains.

Much is said concerning stock gains. I shall not discuss the evidence in detail. There were, in certain stores, substantial stock gains, sometimes due to improper methods, which defendants promptly attempted to correct. There were losses likewise. I can not convince myself that the evidence is conclusive that stock gains were intentional or other than what might happen from any number of reasonable causes. I think that such gains must be eliminated as a factor contributing in any way to violation of the anti-trust laws.

### Alleged Coercion in Purchases of Manufactured and Processed Food Products.

The Government insists that defendants have consistently obtained unjustified substantial buying preferences from food suppliers. We are only incidentally interested in concessions procured before 1940, for the illegality of what had been done largely before that time was established by the United States Circuit Court of Appeals for the Third Circuit in its affirmance of the cease and desist order entered by the Federal Trade Commission. Great A & P Co. v. F. T. C., 3 Cir., 106 F.2d 667, certiorari denied 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521. Earlier in 1933, the Secretary of Agriculture had issued an order against a supplier to cease paying brokerage fees to A & P, which was approved by the court in Trunz Pork Stores v. Wallace, Secy, 2 Cir., 70 F.2d 688, 689, when it said: "The practice followed may well have been considered discriminatory and deceptive and therefore violative of the Act. By the payment of the commission the Great Atlantic & Pacific Tea Company received an advantage over competitors."

While the third circuit litigation was pending, special concessions were placed in escrow pending the decision. During this period, the Government contends, defendants placed on an unfair list, various suppliers with whom they would not do business because such persons would not accede to A & P terms. Zoller commented that there was nothing that would bring a manufacturer around like "putting him on the bench"; and Parr, that, when customers declined to work on a net basis, they should be placed on the "unsatisfactory" list.

The Supreme Court having refused to review the decision of the third circuit, defendants determined that they would not, if they could avoid doing so, buy from suppliers who dealt with brokers. A company memorandum, apparently not finally issued but considered by various officials, said that the company had decided to adhere to the direct-selling method, that "Manufacturers who decide to adopt the direct-selling method should be careful that they do so without reservation. Some may feel that if they sell the great bulk of their goods direct, * * * it will do no harm to make an occasional sale through a broker. * * * this would make the method illegal unless the seller increased the price charged direct buyers by the amount of brokerage, which would defeat the whole purpose of the arrangement."

Certain brokers complained as to the propriety of the attitude of A & P, and Zoller, Baltimore buying agent, said February 3, 1940 that a certain broker had threatened "that canners who come in exclusively direct will be running afoul of the anti-trust law, also triple damage. * * * These brokers are dying hard."

On January 30, 1940 all buyers were instructed to urge all suppliers to abandon all broker sales and to report suppliers who agreed to comply. Vogt and counsel attended the National Canners convention in Chicago and discussed the subject with persons attending. Counsel wrote Bofinger that he had interviewed a cross section of

suppliers and that Vogt was doing "a swell job" in his territory. Counsel's interpretation of the situation was disclosed in his report of an interview with the Morgan Packing Company. "If Morgan would lower his prices to all buyers by the amount of brokerage and make the buyer pay the broker, he would have a perfect set up." If "his price through brokers was $1 and he paid 5¢ brokerage, he could sell to all buyers at 95¢ and let them pay the broker. Small buyers who purchase through brokers would still be paying $1 for their goods (95¢ to Morgan and 5¢ to the broker), but A & P, Kroger, etc., would not have to pay a broker and would hence be able to lay their goods in at a net price of 95¢. This would be perfectly legal. However, the brokerage fraternity would oppose it tooth and nail. * * * Morgan remarked on the change of attitude on the part of packers * * *. Several years ago many of them wanted to get out of passing along brokerage to A & P. Now that the court has told them they can not do it, however, they realize the error in their thinking."

It was perfectly natural that this campaign by the largest buyer in the industry resulted in a great number of suppliers becoming exclusively direct sellers. Wilson, New Orleans buying agent, wrote on April 4, 1940 that he had almost completely lined up his suppliers on a direct buying basis. Zoller said on March 1, 1940 that he was buying 90% of his products from exclusively direct sellers. One supplier said that he did not understand just what A & P. wanted but was ready to comply, saying: "The effect * * * will be healthy for the canning business as a whole by the elimination from A & P patronage of small, weakly financed and poorly operated canners who have constituted the chief pest to legitimate packers in the past, these being the little plants operated through and by the commission houses."

Field buyers who gave orders to suppliers who were not committed to direct selling were criticized. Thus, August 20, 1940, Parr wrote Vogt that "it is very important that we place all our business as far as possible, with concerns who do not employ brokers at all." Southern States Foods, Inc., was informed that A & P

would buy no potato salad from it if it used any brokers, regardless of location. Concerning a packer of mushrooms, Zoller wrote: "If he does not elect to come direct with us we should spread our business around a little more than we have been doing." And on March 2, 1940 Zoller advised Parr: "If Musselman and National do not line up exclusively direct we feel that other canners will be equipped to supply the products which we are now buying from them." Other instances of like expression appear in the record. Apparently the direct appeal to suppliers was not put in writing. Diehl, National Butter Department, wrote to Parr, March 26, 1940, saying: "We have not requested (in writing) any shipper to stop using a broker."

United States Products Corporation received this advice from its counsel: "I have given careful consideration to your problems arising out of the announcement of the Great Atlantic & Pacific Tea Co. * * * that it will purchase its products only direct from manufacturers, and then only from manufacturers who do not sell to brokers." He suggested formation of a second corporation saying: "Those persons who desire to buy from you direct would place their orders direct, and you would sell them at your established prices. The corporation to be formed would buy from you its requirements of your products for the purpose of resale to such portion of your former trade as was sold through brokers. * * * No brokerage whatsoever will be allowed by yourselves; the brokerage, if any, shall be allowed by the corporation to be formed." Parr expressed approval. Thereupon the supplier created a second corporation, the United States Products Corporation, Limited, which took on the brokerage sales and left to the other company direct selling. The buyer reported to Parr saying: "The United States Products Corporation have decided * * * to eliminate all their brokers, which will give us a wonderful source of supply for a great many items." Obviously to run the second corporation, pay the expense of extra bookkeeping, invoicing, etc., necessitated additional expense to the stockholders of the supplier which somebody had to pay; the Government insists that it must have

been those competing customers who bought from the new corporation through brokers.

This distinction between broker and direct buying naturally resulted in two price levels. Zoller February 8, 1940 said: "With exclusively direct selling and selling through brokers, two price levels will develop of which the direct will average lower." Parr replied: "We think * * * the difference between the two will be considerably more than the brokerage rate itself, because the direct sellers are going to save and be able to pass on to their customers a great deal more than mere brokerage. In addition to the brokerage differential, exclusively direct sellers will have for their customers only large concerns who buy in quantity lots, pay promptly, and immediately put the merchandise into consumption." On February 17, 1940 Zoller said: "As the direct sellers will get the cream of the business, carrying with it the volume, they will build up and will be in a position to materially under-sell indirect sellers." All this could mean only that defendants contemplated gradual evolution of a group of exclusively direct suppliers who would have for customers only large concerns and who would materially under-sell indirect suppliers. The spread between the two price levels Zoller estimated at 5%. There is a letter in this respect, not dated, but which I think it can safely be said was written in 1940, from Vogt to Parr in which he said: "* * * I am sure Headquarters will figure out a way for us to continue to collect brokerage either as we have in the past or some other form. Don't kid yourself about A & P not having any friends amongst these sellers. I am really surprised the way they come in and offer suggestions to permit us to get the brokerage or its equivalent." The plan worked to an advantage in A & P over retailers who were compelled to buy through brokers. They were restrained from purchasing from any supplier who agreed to refrain from selling through brokers and compelled of necessity to turn to suppliers who necessarily sold at a price level higher than that of the class from which they were excluded as purchasers, says the Government. Further, as a result, it contends, the commerce of brokers was curtailed and diminished and restraints effected also on the supplier level, for suppliers who did not agree to sell direct and to abandon brokers were cut off of A & P's supplier list and thus denied the opportunity of competing with suppliers who agreed to adopt A & P's suggestion of selling only direct. Moreover, says the Government, suppliers who agreed to sell only directly, restricted trade by narrowing their own market possibilities.

Defendants insist that all they did and said in this respect amounted merely to statement and maintenance of policy, but the Government answers that Zoller on September 6, 1940 said: "In reference to Sisk & Son, we not only have their letter, but * * * had a conference with them in which they assured us that they were going to sell exclusively direct and pay brokerage to no one. We have no knowledge of them violating this agreement." Zoller on April 26, 1940 also wrote a supplier who had elected to sell canned grapefruit exclusively direct, saying: "You have also agreed in the event that you decide to change your selling policy that you will give us a written notice of thirty days in advance."

### Alleged Preferential Concessions, Allowances and Discounts.

There is a sharp controversy as to so-called preferential purchase prices. Obviously, a buyer who buys in larger amounts is entitled to reasonable proportionately lower prices and defendants contend that all preferences enjoyed are consistent with this economic fact, while the Government insists that defendants have continuously attempted to secure discounts not justified by quantity purchases.

In the early stages A & P's discounts were of various types. One provided for graduated percentage discounts upon ascending totals of annual purchases; another for a flat percentage upon attainment of a specified amount of purchases over the year. In each, quantities were computed by totalling all orders given by all units in the course of a year. Another arrangement purported to commit defendants to a total dollar purchase figure but covered

such varied products that there is doubt as to whether the figure had any significance. Still another procedure was employed where a supplier offered A & P a lower price which had no apparent justification other than avoidance of loss of A & P's account.

Defendants were reluctant to and seldom did bind themselves to buy specific quantities. Thus in 1939 it was said: "we can not commit the company for any definite quantity nor book any firm orders in order to obtain a quantity price." The discount form recited that A & P agreed "to buy * * * a large quantity of merchandise," and that, in view of purchases of "large quantities," the manufacturer agreed to allow a quantity discount. In 1939 counsel advised that the statement that a discount was given because of "large quantities" was "definitely misleading." Headquarters suggested that instead of separate contracts with two of Consolidated Biscuit Company's subsidiaries, it would be preferable to have one with the parent corporation, permitting A & P to pool the quantities bought from the separate subsidiaries and "reach a higher bracket." Thus the purchases by all units of different products from all Consolidated plants were combined, and at the end of the year a discount based on the total paid to headquarters. Coca-cola of New York's 25 branches were delivering to A & P stores as they did all other retailers, direct from trucks and had quantity discount agreements with A & P's respective units, which in 1941 were supplanted by a headquarters contract whereby the discount to each unit was replaced by straight invoice prices subject to a discount to be determined by the combined purchases of all units. Thus, the government points out, A & P received, in the first quarter of 1941, a discount of 7½¢ per case on 7107 cases, from five branches which also sold a small chain, Bohack Company, which received 5½¢ on 6122 cases. In the second quarter Bohack received from the same branches 6½¢ per case on 13,000 cases; and A & P 10¢ on 15,900 cases. However, A & P purchased from other branches also and its total purchases were much larger than Bohack's.

A contract proposed by Armour provided that purchases should be at current "list" prices but, at A & P's request, this was changed to read, current "market" prices. A & P had contracts with Illinois Meat Company for 1941 and 1942, details of which I do not deem it necessary to mention. In each case, it is impossible to say there was either a manufacturing, delivery or appreciable sales expense saving.

Hills Brothers Company gave defendants 2% provided they purchased 60,000 cases of citrus products in 1941-1942. Hills called it competitive discount; A & P, quantity discount. A & P, the largest purchaser, alone received the discount. Hills' president testified that he found that he was losing A & P purchases to competitors quoting lower prices. But competitive situations with other customers were not met by similar discounts. I think it clear that fear of losing the A & P purchases led this manufacturer to grant a preferential discount even though he felt he was selling a product superior to that of his competitors.

Walker's Austex Chile Company gave a quantity discount of 5% to A & P from 1936 through 1943. Originally Wilson said that the discount "will naturally take the place of the brokerage which we had previously enjoyed." Walker's representative testified that his company believed the discount justified by the fact that on sales to other customers salesmen called upon retail stores, whereas A & P contacts were made only with distributing warehouses. However, Walker paid A & P another 2½% for advertising services as well as special allowances to many of the units. Walker never, so far as the record shows, offered the same terms to others. The 1941, '42 and '43 contracts were drawn on a cost savings basis. Counsel objected to the verbiage saying that whereas the agreement as drawn speaks of "large volume" and "large shipments" the real saving is in the quantity of each shipment and not in the total of yearly purchases. However, apparently the idea of the change from "large quantities" to "large shipments" was abandoned, as it was found that, whereas total annual purchases might be large, shipments were usually compara-

tively small. Parr thought that the agreement was the best type because a "manufacturer can justify a savings in his own cost in manufacture, sale of, or delivery on our business" and desired to supplant sliding scale quantity discount arrangements with cost savings. While Walker agreed to go along, many suppliers preferred the old form. Cranberry Canners wrote that the new contract might lead to an uncomfortable position for both supplier and purchaser and that "any amount of people are taking the same large shipments you do and you are not buying by any different method than the others. * * * We cannot * * * show * * * economy. * * * it would be unwise to claim it. * * * we simply give you the discount and when the time comes to prove it is justified we are not handicapped in any way." The sliding scale contract continued. Hunter Packing Company accepted the savings agreement only after a change in wording from "regular prices to quoted prices," requested by Hunter because the prices at which it sold A & P, were generally lower than those to others; as a result A & P received not only the discount but lower prices. Hunter received orders from each A & P store each day, delivered as to other customers, and made no deliveries to warehouses. The sales manager discussed with A & P the latter's special price list each Friday. Hunter's president testified that he told his salesmen to seek other contracts on a price basis equivalent to A & P's, and one invoice was produced showing one item sold one day at the same price A & P had paid, before taking the discount into account.

A & P received 10% from Sylmar Packing Corporation under a cost savings agreement in 1939-1940, the only discount in Sylmar's records for that year. The contract was renewed for 1940-1941, when Sylmar created a subsidiary, the Los Angeles Olive Growers Association, which sold the same olives that Sylmar sold to A & P at 5% under the price Sylmar charged its customers for the same olives, though it did allow two comparable discounts to other wholesalers. It is difficult to apprehend any reason for creation of a subsidiary selling the same goods and granting special discounts to A & P other than to avoid the appearance of special privileges to A & P. Beckmann in 1939 arranged a discount of 15 to 20% and another of 10% on pineapple juice saying "if not kept confidential we will have difficulty in securing such concessions." Other favorable purchases were made without formal contracts.

The Wisconsin Honey Farm offered honey at $4.25 per dozen in carload lots f.o.b. Oconomowoc. In May 1940 Vogt demanded explanation of a low price by a retail competitor at Madison. The supplier replied that it had sold the rival at $4.25 f.o.b. Oconomowoc; that it would gladly sell A & P at that figure with a 5% advertising allowance, as it would like its product back on A & P's shelves. Vogt replied that the price should be $4, saying, however, that an advertising allowance could not be used to reduce the cost of merchandise. Though the original proposed purchases were in carload lots, the parties finally agreed that A & P could buy LCL at $4.10 f.o.b. Oconomowoc for Boston and $4.25, delivered to Chicago warehouses. The supplier made and offered to make no sales to others at those prices. Most sales through brokers at that time at the same place were from $4.50 to $4.75.

A & P bought potato salad from Wheatley in 1941 at 90¢ per dozen for the 14 oz. size and $1.10 per dozen for the 16 oz. size, less 5% discount for promotional work. Wheatley said that the quotation was based on volume and that he made the same price to all distributors in position to give him the volume. However, his regular price to others in a price list issued April 15 was 95¢ on the 14 oz. size and $1.15 on the 16 oz. size.

A & P bought milk from a New York Dairymen's League subsidiary in Buffalo from 1937 on. Mylott informed the divisional director that "confidentially, our arrangements with the League call for their paying us a discount of 5% on purchases made from Weckerle, but, since they do not want Weckerle to know * * * payments will be made to this office and it will be necessary to devise some method for passing this allowance on to the Buffalo

stores. * * * it is important that we keep the matter strictly confidential."

Crocker, General Superintendent at Dallas from 1927 to August 1939, testified that local suppliers paid discounts, after enactment of the Robinson-Patman legislation, in cash, which, under instructions of Adams, was kept in a safety deposit box and did not become a part of the general funds. Crocker thought this was a general practice throughout his division, but he had no first-hand knowledge of that fact and, hence, I have ignored his testimony in that respect. He said that he called Houston to see if it had any money in the special fund when his own ran short. The president of Mrs. Baird's Company in Dallas testified that he made quarterly payments in cash until early in 1938, when he desisted, but that shortly after Black succeeded Crocker, Black said that he believed Baird owed a discount for the period after its discontinuance and that he, the witness, promised to resume payment as of July 1, including some past months; that he did so and made payments through the second quarter of 1941. Black denied the conversation but not that the unit received the discount. A report of Los Angeles in 1937 disclosed payments of discount by one bakery in cash, but without the divisional purchasing agent's approval. The divisional treasurer testified, however, that these discounts passed through the records in normal fashion.

In purchasing from Hills Brothers, A & P refused to accept Hills Brothers' practice of offering premiums for purchases of more than a stated lot but agreed to accept 3% discount in lieu of premiums. Hills' president testified that he "thought" he had offered this alternative to two others but that he did not offer it to everyone because "it simply would have upset things."

Quaker Oats, in the last half of 1943, sold A & P private labeled packaged oats at $1.80 after deduction of 10¢ for label allowance. It sold all others except American Stores at $2. This, the controller said, was done to meet competition. One of its competitors was Ralston Purina. At the same time Quaker was selling to A & P bulk rolled oats in bales, containing ten 5-pound bags while 42 out of 53 other purchasers received bales of nine bags; 40 of these were paying more than A & P paid for 10-bag bales.

Ball Brothers gave special prices to A & P, as it said, to meet competition and to represent savings. It placed most of its goods on consignment but sold A & P for cash. Cash customers including A & P received a discount of 2% of total purchases and an additional 5% discount. In 1939 an extra 4½% discount on caps was given A & P, but not to other purchasers, as Ball said, to meet competition. Kroger received 2½%. In 1940 A & P, requiring allowances to meet competition, received a rebate check for 7¢ per gross. This was not given all customers. In 1941 A & P received a retroactive price adjustment on 50,000 gross of caps. This was not quoted to others but was made, Ball said, to retain the business. All the special payments went to headquarters. Defendants offered evidence that whenever they told Ball of competitive offers, they named the competitors, but there is no evidence as to the character of the competition.

In the quantity discount contract the manufacturer avowed willingness to make "the same agreement * * * with any other purchaser similarly situated on proportionally equal terms." After the Third Circuit's decision, this was revised to read: "The seller warrants that the quantity discount * * * does not reflect any brokerage or brokerage savings whatsoever, and is available on proportionally equal terms to all other buyers, after making due allowance for differences in the seller's costs (other than brokerage) and for the seller's right to select his customers or to change his prices in response to market conditions or to meet competitors' price." Defendants' counsel advised: "The next clause is important. It places the burden on the manufacturer to make the discount available on proportionally equal terms to any other competing buyers * * *. In the absence of actual knowledge on the company's part, this clause would protect it from liability under Section 2 (f) of the Robinson-Patman Act, 15 U.S.C.A. § 13(f), in the event the manufacturer failed to accord the discount to some deserving buy-

er. * * * In the absence of actual knowledge that the discount was no longer justified by savings, the company could sit tight until the manufacturer gave notice to the contrary."

I have not been greatly interested in what either defendants or their suppliers said in this respect. I am essentially interested in what they did, and, considering all the evidence in this respect carefully and drawing from it only such inferences as I think inevitable, it seems to me that, though defendants have been careful to secure from their vendors avowals of compliance with the Robinson-Patman Act, they have been far from meticulous in acceptance of preferences which, under the facts and circumstances they knew or should have known other purchasers did not receive and that they so acted as to procure preferential discounts either under that term or other terms resulting in an unfair competitive advantage.

### General Advertising Allowances.

The Government claims that advertising allowances have been obtained by A & P, in lieu of brokerage, rebates or discounts, affording A & P advantages tending to suppress competition. In 1927 defendants eliminated "rebate" and "confidential allowance" and substituted "advertising allowance" which they treated as "confidential." Defendants admit that there is voluminous evidence that many suppliers violated the law in granting A & P buying preferences but they say that they had no knowledge of such preferences.

Defendants take the position that they were at all times opposed to promotional advertising. They say they well knew that Section 13(d) of Title 15 of the U.S.C.A. makes payments for advertising to one customer improper unless made available on proportionally equal terms to all other competing customers. Defendants aver that, though they were opposed to advertising allowances, they found them prevalent and difficult of eradication and, therefore, pursued the line of least resistance and of necessity accepted the practice in order to meet competition. They claim to have performed the promised services, pointing to the minutes reciting that their policy was "to give the most complete cooperation possible to the manufacturers" with whom they had advertising deals. It was said in a letter from Bofinger to all buyers on October 28, 1936: "Advertising allowances are prohibited under the Robinson-Patman Law unless services are rendered. Our policy, therefore, demands that the company be found acting in good faith in administering the services."

From Albany Packing Company, A & P had been receiving a discount of one cent per pound, allowed other customers also, and an additional one cent per pound advertising allowance, not offered others. In 1941 it asked the supplier to withdraw the advertising allowance and quote a price reflecting both discount and advertising allowance so that the price would be two cents per pound less than the price list sent others. Albany later advised A & P that other customers had complained and the contracts were not renewed. Obviously such an allowance deducted from the invoice amounted to reduction in cost.

A & P was receiving an advertising allowance from Armour. In February, 1941, its meat department reported that it had tried to persuade Armour to deduct advertising allowance from the invoices and that Armour had refused, saying that it could not afford to offer the allowance to all customers and was therefore restricting it to those chain stores in position to render advertising service. A & P apparently did not approve, saying: "Since it is being offered to our chain competitors, we are submitting it to the organization without recommendation."

The standard form of advertising allowances read: "Certain Special Advertising and Special Distribution service, supplementing the National, Sectional and Local Advertising of the Advertiser, which special service includes periodic newspaper advertising, handbill advertising, periodic store displays with advertiser's merchandise in a prominent position readily accessible to consumers, and periodic notifications to branches of support to be rendered Advertiser's products at point of sale." Obviously this permitted indefinite flexible performance and, from the record, the con-

tract was phrased thus loosely intentionally. The director of purchases of central warned "we will advertise the product in keeping with the support we feel it is entitled to." Mylott wrote August 6, 1941, "we do not think (we) should be pinned down to any specific sized add." Earlier, April 6, 1927, Bofinger stated "we never agree to any specific support until we have exhausted all possibilities of effecting a deal otherwise." Gundrey, in October, 1940, said "our agreements are drawn broadly, with no specific performance required but some general support is a legal requisite to justify acceptance of the allowances * * * if you see the minimum is given, everything should be satisfactory." In other words, the contracts were specific as to what should be paid but vague as to performance.

This evidence, with circumstances in the record, is convincing that advertising allowances frequently performed the same function as allowances in lieu of brokerage, rebates or discounts and were, in view of the fact that in many instances correspondence with suppliers shows clearly that the same terms were not given others, frequently infractions of the Robinson-Patman Act. It is difficult to attribute good faith to one who requires allowance of a specific sum of money by one who sells him merchandise when the purported consideration for that allowance is indefinite, uncertain and incapable of being enforced.

True, many suppliers avowed that others were offered the same proportionately equal terms; but, in view of the fact that defendants knew, indeed, could not help knowing, that frequently other distributors did not receive the same beneficial treatment the formal language fades in significance. An illustrative case is that of Larsen who in 1937 had offered a 10¢ per case allowance to all customers "deemed to have proper facilities for advertising." In 1939 Larsen was willing to make an allowance of $10,-000, provided A & P featured his products twice a year. Bofinger wished to eliminate the covenant to advertise twice a year. Larsen insisted upon two features but said he was willing to leave the time of performance to A & P's discretion. Mylott replied that, if Larsen persisted, it would

be necessary to pass up the contract. Larsen eventually signed the form desired by A & P, which would have been difficult to enforce because of vagueness. Mylott's instruction in January, 1940 was that "we have agreed to support the product whenever and wherever possible." In November, negotiations for renewal began, Larsen indicated he could not pay more than $11,-000 "considering legal requirements and the arrangements * * * with other distributors." This was plain enough to put defendants upon notice that arrangements different from those proposed by A & P were being made with other distributors. Eventually, the contract was continued in non-specific form and the allowance raised to $12,500. Similar events occurred at the end of 1941, when Parr demanded $20,000, Larsen, insisting that it was too high; finally the allowance was fixed at $17,500. From October 1, 1939 to September 30, 1942, A & P collected $40,000 from Larsen or .08918¢ per case, whereas all other customers collected, .03315¢ per case. The record indicates also that other customers signed contracts for definite and specific service.

Concerning A & P's three forms of advertising contracts on April 22, 1938, it was said that since the enactment of the Robinson-Patman Act, headquarters had effected advertising deals of three types: one, affording flexible conditions of compliance; another, including manufacturers' provisions for a specific performance; and the third, such as the soap deals, where, without signing contracts, "we are at a distinct disadvantage under the third type of agreement." A & P attempted to procure more favorable terms from the soap companies. It said, April 11, 1939, "we have no obligations to the soap companies and no more cooperation should be given them than necessary in order to qualify for whatever allowances it is felt to be good business to earn * * *. No opportunity should be passed to let the soap companies know that we are not at all satisfied with their present policy."

Bofinger testified that he is opposed to advertising allowances on principle and certain representatives of the soap companies corroborated him; but, of course, they

knew nothing of his attitude toward allowances under the first two types of contracts because, in dealing with Bofinger, the soap companies declined to give him preference. One other witness, a representative of General Mills, Inc., testified that Bofinger expressed himself as averse to advertising allowances.

Defendants constantly strove to do away with advertising contracts made by divisions and units and to have only contracts with headquarters. When a manufacturer refused to make a headquarters allowance in the belief he could secure better results by dealing with units, headquarters advised in May, 1940: "Headquarters does not like their attitude * * * if any of their representatives should contact you, discourage any attempt on their part to try to make local arrangements."

Virginia Dare Extract Company contracted with headquarters to make an allowance of 5% to be paid to A & P's central western division by Virginia Dare's representatives. There is no evidence that the same offer was made to others. One of Dare's distributors, McKinzie of Danville, Illinois, was instructed to sell Dare's regular retail customers at 45¢ per dozen but A & P stores at 45¢ less 5%, upon proof of advertising. McKinzie sold A & P stores throughout the summer of 1941 on the reduced basis and all other retailers in his territory at the regular price. As the record stands, there was clearly a preferential allowance for advertising by this house.

The Wheatley Mayonnaise Company incident illustrates a retroactive allowance agreement. A contract signed in September, 1941 made allowances from January '41 to December '41. Counsel advised that contracts for advertising services to be rendered are wholly different from those providing compensation for services already voluntarily rendered; that there could be no way to establish a proportionally equal basis in such a contract, for it was a gratuity, obnoxious to the law. The arrangement seems to have been corrected later with the exception, on January 15, 1942, of a contract for 5% from January 1, 1942 to December 31, 1942.

Wheatley sold Albrecht **Grocery Company**, a chain of 84 stores, with a 3% advertising allowance upon proof of performance. His contract with A & P required no such proof. He said that in large chains, "we have always offered 5%—where there was no brokerage connection"; that when there was a broker he split the brokerage, allowing the broker 2% and the chain 3% and that where the chain was not in position to give him proper service, he did not allow "this special arrangement or special discount." Apparently it was his policy that, whether the allowance was brokerage or advertising expense, it would not exceed 5% and where brokerage was allowed, only the remaining balance of the 5% was allowed. This bears all the signs of being an intentional allowance in lieu of brokerage.

On April 29, 1941 Wheatley wrote quoting a special price 5¢ under its price list. In addition he offered a 5% advertising allowance, which he described as "available to all distributors in position to give us the volume." Vogt replied that allowance could not be based on volume but could be based on amount of advertising furnished. Wheatley wrote that the 5% did not reflect brokerage, as he knew it was impossible to use volume of goods as a basis for advertising allowance. The change in words indicates clearly that the allowance was not based upon service rendered but rather on quantity purchased. The connotation of the correspondence and the circumstances is such as to produce a conviction that here were clear, plain, though equivocal, preference allowances.

In June, 1938, Utley, of Capital City Products Company, wrote that the 1% per pound so-called quantity discount he was allowing was too high and that his attorneys advised him that he was not justified in continuing it. Mylott replied that Utley might sign either a quantity discount or advertising contract or both. Utley replied offering ½ cent per pound advertising allowance but not ½ cent per pound quantity discount. Mylott refused to "go along on the basis suggested." On August 9, 1938 Mylott wrote to Utley: "Before making several contemplated changes in our merchandising policy surrounding the sale of margarine, we should appreciate your call-

ing to see Mr. Bofinger and the writer" as soon as possible. So Utley went to New York and there Bofinger told him that if he was not interested in paying 1¢ per pound A & P was not anxious to do business with him and walked out of the room. Mylott told Utley that he had angered Bofinger but that he, Mylott, would talk to Bofinger and see if he could not straighten things out. Utley returned home. A & P forwarded him a contract calling for 1¢ allowance and Utley signed it. Headquarters then said in a bulletin: "We have been negotiating for sometime past with the Capital City Products Company * * * we have concluded an advertising arrangement whereby it is possible for our company to earn a substantial sum of money by pushing the sale of Dixie Brand margarine." Utley testified he did not know whether this allowance was offered to others, but that he did know that no other customer received it; that other chain customers received temporary advertising allowances but that A & P received that type of allowance also in addition to its exclusive 1¢ per pound advertising allowance. Apparently similar contracts were tendered to Kroger and First National stores and others. None of these accepted. In 1939 Utley again questioned the legality of the allowance, but Mylott assured him that it was perfectly legal and thereafter, by successive renewals, the allowance was paid through February, 1944. It is clear what defendants wanted was a 1¢ discount and it was immaterial to them whether this was a quantity discount or an advertising allowance or in part, one, and in part the other.

In August, 1941, Minnesota Valley Canning Company discussed allowances, proposing $150,000; Bofinger insisted upon $175,000, and Minnesota finally agreed to pay that sum. There was extended negotiation concerning the amount and the circumstances are such that unless similar arrangements were made with others, undoubtedly what A & P was receiving was preferential. Again, I think the circumstances such that A & P was put on such notice as required it to inquire and to ascertain. Thus, when in September, Minnesota proposed to omit A & P's suggested clause of compliance and to incorporate instead the clause: "the distributor agrees that the charges are comparable to those made other advertisers for other comparable services," A & P replied "The company is definitely opposed to incorporating the clause you refer to. Frankly, this suggested clause is * * * an attempt to place on us the responsibility which rightly belongs to the shipper. * * * it is up to Minnesota * * * to justify whatever arrangements they have on their books." The contract, as finally drawn, contained the avowal clause of A & P's standard contract. Minnesota did not expect the A & P to furnish advertising at actual cost of printing or in the actual amount it paid the newspaper; A & P paid the national rate, not the local rate. It was expected to and did receive the margin above the lineage rate. Some customers got more than 10¢ a case for advertising and others less. Minnesota's records disclose that in 1941 A & P purchased 1,120,934 cases and received an allowance per case of over 15¢; that Kroger purchased 106,667 cases and an allowance of 9¢; that Safeway purchased 276,091 cases and received less than 2¢; that American purchased 100,012 cases and received 13¢; that First National purchased 32,507 cases and received 10¢; that N.R.O.G. purchased 187,421 cases and received 10¢; that all other customers purchased 1,628,873 cases and received an allowance of 7¢. It is hard to reconcile the negotiations had with this company, the protest over the language used and all other circumstances with the direction of Bofinger to "continue to exercise the greatest of care that none of their activities violates the Robinson-Patman Act."

A & P has required certain suppliers to file with it letters framed by A & P and forwarded to them for signature certifying that no concessions were tendered A & P violating the Robinson-Patman Act. The facts do not square with utter sincerity on the part of defendants in this respect. Thus in April, 1940 Morrow wrote Brillo Manufacturing Company, who had signed a regular A & P form, asking if he used a form with the rest of the trade differing from A & P's. Brillo replied that his ad-

vertising allowances in no event exceeded 6%, enclosing his form which specified definite amounts of newspaper space, the names of newspapers to be used and detailed descriptions of posters, circulars, and radio advertising to be furnished, provided that no payments would be made without supporting evidence by the customer and required that no similar products be featured during the periods in which Brillo was advertised. Brillo had "varying percentages and payments under that contract," the lowest being 2% and the highest 10%. A & P's rate was 10%; that of First National 9½%; Paxton Wholesale Grocery Company of Danville, a chain store organization, had an allowance of 5%. A & P was then collecting a 10% advertising allowance from Brillo under a contract originally made in 1938 and renewed each year automatically until 1944, in which the service prescribed was far from specific and which did not contain any requirement that proof of performance be furnished or that products similar to Brillo's were not to be featured. It did contain an avowal of the same terms to other distributors. Morrow asked the president, Loeb, why he was paying A & P 10% when his maximum allowance to others was 6% and says Loeb replied that he considered A & P's services worth more. However, it must have been obvious to defendants upon comparing the Brillo form with the A & P's form that performance required of A & P under its contract was much less than that imposed on other customers and that A & P's allowance was proportionately greater than that received by other customers. The difference between a 10% allowance and a 6% allowance is a differential of 40%, which in any commodity is of tremendous advantage in competition.

In 1939 A & P tendered the Grass Noodle Company an advertising contract calling for 5% allowance on the invoice. This was executed and the allowance continued in successive contracts through 1942. No other Grass customer received a straight 5% advertising allowance. Grass testified that he never offered it to any customer other than A & P but was willing to do so.

A strong circumstance against the premise that so-called advertising allowances were not in fact discriminatory allowances arises from the fact that A & P avoided, whenever it could, any specific advertising commitments, and frequently collected allowances of percentages of quantities purchased rather than allowances for services rendered.

### Alleged Allowances for Pretended Services to Suppliers.

A & P has collected allowances for floor space rentals, special newspaper supplement sales, special circular space sales, mass displays, sign space rentals and labels. Frequently the services rendered were essentially ordinary services carried on by A & P in promotional efforts to improve its own sales and only collaterally, if at all, of benefit to suppliers who paid for them. And the question at once arises, if they were beneficial to suppliers, why not, instead of asking for allowances that eventually go to reduce costs or to supplement retail profits, keep account of the cost of the special services rendered suppliers and render them bills for the actual cost? That would be the open, above-board business method. If advertising is to be rendered suppliers, why should it be turned into a profit? A & P is a grocer, not an advertiser. Thus, Gundrey, assistant to Bofinger, said: "In connection with collateral merchandising support; it is not intended that this be an exceptional activity but merely what is usually done in the ordinary course of business and, in your negotiations, not emphasized too heavily." I refer to the further statements of Gundrey and the Boston Sausage and Provision Company, Brillo and Capital City incidents.

It is clear that defendants were receiving preferential allowances. They assert, however, that this fact was unknown to them. However, suppliers in certain instances brought to defendants notice or knowledge of facts sufficient to charge them with notice that other customers were not receiving the same proportional treatment. Thus a letter from one supplier complained that it had experienced embarrassing situations with other traders

who had asked why it did not "do something similar for them."

As to label allowances, Vogt said in 1940 that certain sellers were "making different allowances, in many cases less than ours" to other customers. True he insisted that this did not involve discrimination but, despite his protest, upon all the evidence, I can not escape the conviction that there was discrimination known to A & P constituting an advantage employed by A & P in its competition with others. Some suppliers protested. One thought canners were opening themselves to criticism by paying more than the usual $1.50 allowance for labels. Parr commented: "This places us in a rather embarrassing position * * * we dislike being put in the position where we must ask a higher rate from this particular canner than he allows to other customers. * * * if he declines to use the $2 rate there is little more that can be done, except * * * to discontinue placing orders with him."

Admittedly A & P was opposed to premiums. It earnestly desired to discourage them. The Government claims that some steps taken in that direction were unlawful because they amounted to coercion of suppliers to refuse to deal with people who made use of premiums. Counsel in March, 1941, wrote that he had heard that one association with which A & P cooperated was compelling manufacturers to refrain from the use of premiums "by recommending boycotts" and that, if true, the practice amounted to violation of the anti-trust laws. Leach denied compulsion, but counsel advised him to be "very cagey," adding "it might be that an implied agreement not to handle manufacturers' deals could be read into the activities of this group."

About 1938 certain manufacturers began to deliver shipments at the doors of independent retail stores who had no warehouses and had been unable to get direct deliveries without additional cost. Store door delivery benefited these retailers by removing the advantage A & P had enjoyed in deliveries made to it. Again, the Government asserts, A & P, by its threats, prevailed upon manufacturers to eliminate such deliveries. Certain suppliers had made deliveries to A & P's supermarkets rather than to its warehouse. A & P said, "we are thus able to handle huge volumes of merchandise into consumer use by taking direct shipment of fast moving items * * * right to the store." A & P announced that it hoped to persuade manufacturers to "widen the spread where there was a justification for doing so" and "to discourage drop shipment selling" and thus "force the trade generally to put merchandise through the normal and legitimate channels * * * which would * * * find us enjoying an advantage over the independent as far as the net delivered cost" was concerned. Thus, on March 4, 1941 it was said: "We are selling between 75 and 100 cases per week of the Tobin * * * Canned Hams, and are buying these at a delivered price in our stores equal to that which we would ordinarily pay for warehouse delivery. * * * The Oswald & Hess line presents a very satisfactory arrangement for us, inasmuch as we buy the line always as low or lower than warehouse quotations." Apparently A & P protested direct deliveries to others but accepted them itself with the purpose of preventing retailers who enjoyed no warehouse facilities from enjoying delivery except through jobbers or wholesale houses. Thus, on December 9, 1939 we have this report: "We have expanded the * * * direct delivery * * * to our supermarkets * * * in order to effect economies. * * * we are not wholly consistent in that, for the past few years we have attempted to have them widen the spread between direct delivery and warehouse delivery, inasmuch as you know a practice developed whereby manufacturers were delivering direct to retail stores at the carload price. * * * This procedure, of course, resulted in a tremendous savings to the retailers in that it eliminated warehouse handling and cartage charges to the stores, * * * A number of manufacturers, of course, were prevailed upon to widen the spread in order that our warehouses would not be at a disadvantage." A & P has every right to enjoy its legitimate advantages, but it has no legal right to take affirmative steps to prevent others from enjoying their economic rights.

## Atlantic Commission Company.

The Atlantic Commission Company, a subsidiary incorporated in 1926, ostensibly to purchase produce for A & P, from the beginning acted with the full approval of headquarters, as purchasing agent for A & P and as sales agent for certain suppliers. In other words, while buying A & P's needs from producers, it was also representing as broker for outside sales the same producers or others similarly situated as well as buying broker for competing produce dealers and as merchandising jobber in the general market. During its first ten years, it collected from suppliers brokerage on purchases for A & P; during the next four years it collected quantity discounts or bought at net prices. In 1940, after the third circuit decision, it adopted a cash differential buying system under which it bought outright for cash for A & P and sold to others as brokers on regular terms. Its practices over the years leave a bad odor. It exploited its inconsistent positions; it collected brokerage from others for A & P's coffers; its position and its practices created a sharp differential between A & P's purchases of produce and those of its competitors. It persistently selected the highest quality of produce for A & P and the less desirable for its outside buyers, thus securing for A & P not only a buying price differential but also a preference in quality. Obviously the larger the volume Acco handled for customers other than A & P the larger were A & P's subsidiary earnings, inevitably reducing A & P's costs and increasing its annual income. This in turn served to give to A & P's retail units a preferential position in competition with other retailers, at the expense of the latter, who indirectly at least contributed brokerage and other earnings to Acco which in the end came to A & P. Restraint of competition, it seems to me must follow conclusively from the multiple irreconcilable, inconsistent functions of Acco, including its obligation as an agent for sellers to sell high and its obligation as buying agent for A & P to buy as cheaply as possible. Any attempt to perform these and other inconsistent functions, I think it is obvious, must have inevitably resulted in illegal restraint of competition,

when we keep in mind that Acco was the arm of A & P and that all its profits redounded to the credit of A & P.

Sufficient indication of the earlier practices is evident in certain letters. Baum, the general manager, wrote in March, 1937, thus: "Of course our customary brokerage and commission rates for regular trade sales are to be continued as in the past." In June, 1939, Williams said: "Our brokerage would be $25.00 per car on regular trade sales, or 5¢ per bushel in carlots, 7¢ on consignments and 5¢ quantity discount on trucklots or carlots for Teaco requirements." In August, 1939, he wrote: "We are returning herewith the quantity discount agreement executed by Coleman & Roy. You have used the word 'rebate' in this quantity discount. * * * We wish you to use the phrase 'Solicitor's Fees.'"

Subsequent to the decision upholding the Federal Trade Commission in early 1940 Acco, abandoning quantity discounts, tried out the cost saving plan suggested by counsel. It suggested to suppliers that this agreement should net them greater return on merchandise delivered through Acco than on that sold through the broker outlet and that Acco desired to share in the savings it thus made possible to the shippers. Baum remarked that Acco purchased direct on a cash f. o. b. shipping point basis or on a cash f. o. b. basis for acceptance upon arrival as compared with regular term basis, thus necessitating the "seller carrying the responsibility of in transit risks, credit and collection costs." Wehman wrote "Hereafter purchase for account of A. C. Co requirements of the Teaco on a cash basis shipping point, obtaining the best price possible and continuing to sell regular trade customers on a regular term brokerage basis, collecting brokerage from the sellers for the service. * * *"

Baum, in April, 1940, discussing the difference between the cash purchaser and the regular term purchaser and the differential resulting in favor of Acco, said: "As to your communication regarding inferences of the inconsistency of A & P buyers mailing cost savings agreements to sellers with the cost savings indicated, * * * we have decided to only use the

cost savings agreement in very few instances as we have adopted our new procedure on the established customary differential in cash prevailing f. o. b. shipping point prices vs. regular term transactions and it is generally understood that these differentials embody the various cost savings. * * * We have the customary advantages of procuring practically 75% of our supplies for the Tea Co. on a cash shipping point basis." Later he directed his employees to "carry out your consummation of purchases on a cash basis vs. regular terms. In other words, the recognized trading principles of the differentials carried by cash transactions." Though Acco was advised by counsel that so long as A & P and Acco had no actual knowledge that a preference existed, the burden of complying with the law was on the seller, the fact remained that all corporate officials and employees were well aware that Acco was actually taking brokerage on goods it sold for shippers to outsiders and buying brokerage on purchases made for outside buyers, the earnings of which eventually became a part of A & P's annual net profits.

Counsel advised Acco that "so long as a cash discount is available to everyone on the same terms, its size is immaterial." But Acco's officers knew from the complaints of shippers that a previous 5¢ discount which Acco had received on purchases of apples in Washington in 1939, apparently on the net price basis, was not enjoyed by the rest of the market, and Egan had reported to Baum that if shippers were to give a cash discount to everyone, it would cost the Northwestern Apple producers millions of dollars. When in March, 1941, Acco's representative reported that the shippers would no longer allow the discount, Baum advised him that he should tell the sellers that Acco would confine its business to those who extended to it the customary differential price on cash purchases as against regular terms. The obvious implication was that if the producers did not desire to go along, they would have to find other outlets. As defendants remarked in their communications, the differential was not built upon the exact cost savings; it frequently amounted to exactly

the same thing as the regular quantity discount formerly in vogue.

Acco took aggressive steps to see that its suppliers acceded to cash buying. In April, 1940, Ward wrote Baum: "I instructed Mr. Kellam to forward you a list of the shippers in the Norfolk section whom we recommend be approved so that we be authorized to purchase merchandise from them on a cash basis with the understanding that in the event we are unable to inspect the merchandise f. o. b. shipper will protect US #1 arrival." He recommended that certain shippers be listed as having approved the cash buying preferential and as agreeing to apply the idea to sales made f. o. b. but guaranteeing quality to Acco upon arrival. A part of the savings claimed to result to the buyer was lost because of the assumption by the buyer of liability for losses in transit. Baum wrote on April 25: "I wish to change the last instructions * * * stating that in the absence of such personal inspection merchandise is to be bought for acceptance as to grade and quality upon destination arrival. We are somewhat doubtful that this would constitute a cash purchase, hence we have decided that * * * we have a selected list of shippers and effect an agreement with them to the extent that in the absence of our inspection * * * they will protect this merchandise (although we have paid for same) as equivalent to U. S. #1 upon arrival at destination, and, should there be any losses sustained * * * they will assume any losses suffered by us in making adjustments or resale of this merchandise. This list must be approved by this office and the shippers that you wish placed in this category are to be furnished to this office and approved by us." Similar arrangements were made elsewhere. No explanation is made by Acco as to why it should not have reimbursed the shippers by way of increased purchase price for this risk of standing behind the grade. Some shippers were not satisfied. Taylor reported to Ward concerning celery on March 22, 1941: "We shall find it hard trying to buy celery, selecting the 'cream' and at the same time insisting on a net cash price as low or lower than that price which other cash buyers pay, and also asking the ship-

per to guarantee a certain grade on arrival."

Baum directed field buyers to secure produce "on either a straight outright purchase basis, or * * * in the event market conditions are anticipated as treacherous and supplies cannot be secured from shippers, on a price arrival basis." Under this arrangement Acco did not commit itself to purchase until it had examined the produce after arrival. As Acco's field vice president expressed it, "if the shippers don't want the price we offer when the merchandise arrives, they are at liberty to go elsewhere." Baum said: "We have discontinued the term price arrival and handle all of our purchases price arrival and arrival sales under the combination term of arrival sales, usually the price is determined according to supply and demand. When the merchandise arrives Acco wires the offer, if agreeable, well and good,—if not, other disposition is made of their merchandise."

When complaints as to Acco's terminal low price determinations on arrival appeared, Baum defined his policy thus: "It will be necessary for your shippers to accept the price we place on this merchandise at the time of arrival and discontinue this bartering over 5¢ differential and if the shippers find that this procedure is not in accordance with their ideas or they are not given a fair deal on the average over a period of time, then of course it is their privilege to discontinue these arrival sales or price arrivals." These circumstances are material when we consider what Acco was doing in behalf of other purchasers where no such preferences, no such guarantee and no such advantages as A & P enjoyed accrued to the other purchasers and the outside patrons of Acco were contributing to A & P's earnings.

I shall not attempt to review all of the evidence. The inevitable result is that the cash differential with shipping protection, quality preferences, buying at net prices for A & P and at regular prices for their competitors, Acco's policy of charging A & P one price and its other customers another, all worked to create restrictions upon competition and to handicap the competitors of A & P in view of the fact that competitors paid Acco earnings which went to A & P who, did the competitive retailing.

The Government introduces a letter dated July 3, 1940 wherein Acco acknowledged receipt of $81.60 covering a rebate in price, saying: "This shipper found it necessary to reduce his price this amount to other buyers that same day and, therefore, reduced our price accordingly." The auditor found this and inquired and on November 18, 1940, the refund was explained thus: "It so happened that we booked this car of peaches with Mr. Duke at a price, with the understanding that if it developed that this price was too high and that the shippers were forced to reduce their price on any other sales that day, he would protect us against any such decline. Subsequently, it developed that it was necessary for him to sell the balance of his fruit that day at a price 10¢ lower than our price and he voluntarily reduced our price, although we had already paid him for our car." A similar incident occurred with regard to celery where the cost was reduced from $2.25 per crate to $2.00 and from $2.00 per crate to $1.75.

After May, 1940, Acco entered into two types of deals with jobbers. Under one, it agreed to sell carload produce to jobbers and repurchase part of it for A & P in LCL quantities at the same price, waiving its brokerage charges on the latter. This practice obviously permitted A & P to acquire LCL produce without any jobber mark-up, whereas, when others bought from the same brokers in LCL quantities, they paid the higher price. The second type consisted of selling to jobbers without agreeing to rebuy any specific LCL commitment but agreeing to give them preference in patronage if they purchased through Acco in carload lots. Acco then repurchased from the jobbers but did not waive brokerage because it contended that such repurchases in LCL lots were no part of a specific repurchase contract. In both deals Acco secured some brokerage revenue which in turn went to A & P.

Under both of these arrangements A & P received a preferential LCL buying advantage over other retailers in that it re-

bought either at flat carload prices or at LCL prices less brokerage. In carrying out the second plan Acco promised its repurchasing patronage preference to jobbers who used its brokerage service and endeavored to persuade produce shippers to refuse to sell to jobbers except through Acco. This widened further the differential between the A & P's LCL cost and that of competing retailers, inasmuch as Acco received a brokerage revenue which was necessarily imposed on A & P's retail competitors in the form of their higher purchase prices.

The multiple roles of Acco taint the whole fabric of defendants' operations. It has continually sold carloads of produce to jobbers throughout the country as a sellers' broker, collecting brokerage which goes into its treasury and eventually into A & P's treasury and its buying power, thus giving a competitive advantage to the operation of A & P stores competing with other retailers who have bought from Acco and paid Acco its brokerage. Concurrently, in its capacity as buyer of less than carload lots for A & P, Acco buys on spot markets in which these same customer jobbers compete with other independent jobbers for Acco's patronage. The average broker in competition with Acco can not market carlot produce as successfully as Acco, for he sells with no repurchase inducements attached. Dealers who buy carlot produce through Acco know that by so trading they acquire a preferential status with respect to resales of LCL produce to Acco. The resulting ills are obvious.

Brokers, in order to retain the good will of Acco and A & P, paid Acco a second brokerage. Vetter at Louisville bought the same merchandise through both Macaluso and Acco, although the purchases had been completed through Macaluso. Vetter testified that after he had sold Acco peas at $2 and lemons at $6.25, he was required to bill the peas at $1.75 and the lemons at $6.65, indicating that Acco exercised its buying power to control jobbers' terms to A & P to the end that A & P might retail particular items of produce in their stores at less than the current wholesale market levels without showing a loss thereon. Other dealers paying unearned brokerages

to Acco were the Gordon Fruit & Produce Company of New Haven, and DeCarlo of Buffalo, and The Mercurio Company of Providence. These odorous unjustified transactions can not be excused in any manner. However, defendants disclaim any knowledge of or ability to learn of or to prevent them. They insist that it was Acco's policy to charge a brokerage only when service was rendered; that of thousands of cars handled in the markets only an inconsiderable few were questionable; but they overlook apparently the fact well known to all defendants, that brokerage earned by Acco in representing other vendors, buyers and distributors eventually is paid in to the treasury of A & P and appears in the net earnings of A & P, who is in competition with others not enjoying such earnings.

I have no doubt that these specific illegal transactions had the disapproval of headquarters, but the incidents are illuminating as to the extent to which others dealing with Acco, observing its trade practices, were willing to go either in fear of losing its patronage or in order to cultivate its good will. These brokers evidently thought it expedient for them to contribute this unearned tribute and, though some defendants attempted to stop the practice, it seems to me they cannot close their eyes to the consequences, for they were engaged upon a plan of operation whereby A & P through Acco, its own agent, so dealt in the produce market as to create a preferential price to it and a higher price to its competitors, upon the latter of which it received brokerage which in turn became a part of A & P's earnings as a retailer in competition with other customers of Acco who paid the higher prices. This wide scope of operation was entered into deliberately with knowledge of what would happen to the resulting profits and with knowledge that such profits could be used as defendants wished in competing with others. This is misuse of a material factor in competition between retailers, preventing free competition in that it limits the profits of the competitor and increases those of A & P.

## Contact Committees.

In addition to its interest in and influence over cooperatives, Acco created con-

tact committees of producers in various parts of the country, selecting the chairman and, through the chairman, the members. Upon these committees, its competitors had little or no representation. Government agencies were attempting to coordinate distribution. Acco, for some reason, deemed it necessary, to form its own contact committees. Among these was the Northwest Apple Advisory Committee, which was in fact largely Baum's child. He named the chairman and the members. Another was the Stockton Advisory Committee for handling California grapes. Egan established this committee at Baum's suggestion and named Sanguinetti as chairman. The latter had for many years shipped through Acco, had quarreled with it but in the end had renewed his association with it. Baum appointed his friend Snively chairman of the Florida Citrus Committee and Snively selected the other members of the committee, though there was a very active Government sponsored national citrus committee in operation. In North Carolina Baum created the Eastern Shore Advisory Committee and made Mann, who had been the manager of a cooperative closely allied with Acco, the chairman. Baum suggested to Mann the members of the committee. Acco paid the bills for food at the meetings of various committees. Seven such contact committees are mentioned in the record. The Government does not claim that there was anything evil per se in such actions, but it does contend that the control exercised by Acco and its officers over the activities of the growers' cooperatives helped inevitably in the end to bring about discriminatory preferentials to Acco which other purchasers of fruits and vegetables did not receive. I think that such was the inevitable result. One reading the evidence can only conclude that Acco's intention was to bring producer sellers more closely within Acco's influence and to bring about a situation whereby growers and shippers relied more and more and more on Acco's facilities and advice, all of which served to increase Acco's advantageous preferential relationship, its business as selling broker and as buying broker and its resultant profits at the expense of A & P's retail competitors,

all of which went into A & P's treasury and eventually into competition with other retailers.

The Government presented evidence of what it terms deliberate manipulation and demoralization of the retail market. Illustrative are the communications of Conners, head of the national meat department, with other officials, in which he said, among other things, that retail prices on certain meat products should "reflect a sharp advance in order to reduce the demand, which will enable packers to lower the market and stimulate receipts." Without discussing the details, it is apparent I think, that A & P did initiate a retail price of 35¢ for Maine potatoes in Cleveland early in January, 1940, when its cost was 34¢, in the face of the statement of the sales director of one division, July 10, 1941, that "no produce department can be operated at much less than 10% gross profit without showing a tremendous loss." The Government does not claim that defendants should have agreed with producers on retail prices but insists that such low retailing, at prices which A & P's competitors could not meet without loss, demonstrates the power and willingness of A & P so to depreciate prices as to prevent competitors from dealing in the same article.

## Cooperatives.

Acco made a determined and persistent effort to establish a close relationship with and influence over growers' cooperatives, among them the Florida Citrus Exchange, Northwest Apple Growers, Sowega Products, handling watermelons, and Farmers' Cooperative Exchange of North Carolina. The expressions of Baum at various times and places indicate a desire to delve into the cooperative business of his producers and, if not to control it, at least to guide and influence it. Indeed, the transaction with the Florida Citrus Exchange came dangerously near being an agreement in restraint of trade in itself. The relationship with the Farmers Cooperative of North Carolina has been the subject of investigation, indictment and trial, resulting in a directed verdict of not guilty, but the circumstances of that relationship, where Baum named the sales manager and sup-

plied employees for the cooperative, disclose without question that Acco was in effective control of the manager of the cooperative and dangerously near a restraint of trade. In some instances the cooperative managers were on Acco's payroll, and in at least one instance, when not engaged by the cooperative, the manager was employed by Acco. In various and divers matters, Acco came to enjoy a singularly close influence over, if not, indeed, control of, various cooperatives.

The National Cooperative Fruit and Vegetable Association emerged as the result of suggestions of Acco and its officials beginning as early as 1938. Baum reported that in a conference with Hartford it was suggested that a national distributive institute of fruit and vegetable shippers would be excellent for shippers; that Hartford and Byoir expressed interest and that Byoir would be willing to assist in setting up the organization. It was suggested that this sounded something like an earlier organization, Associated Shippers, the principal difficulty of which had been its connection with Acco and that perhaps the new organization would be hindered by any similar connection. At an Acco executive committee meeting June 1, 1939, it was reported that Baum had advised that he had discussed with Byoir and Wehman a suggestion of profit-sharing, under which 50% of Acco's net profit would be distributed to cooperatives. Baum said that the plan would reduce Acco's expense, increase its tonnage, pare operating expenses by at least $5 a car and insure a greater availability of supplies for A & P and that, thereby, Acco would obtain intimate contacts and close working arrangements with representatives of all shippers in all principal fruit and vegetable producing states. Baum put the proposition tentatively to various distributors and Byoir prepared a press release for announcement by Hartford and Smith. However, Hartford suggested that the plan be cleared with counsel, and, as a result, it was never put into effect in its then suggested form.

But Baum was not discouraged. He contacted local cooperatives, including an association of citrus growers in Florida. In May, 1940, he suggested that an advisory board be organized consisting of the heads of large cooperative organizations with whom Acco did business; that the company assume transportation and hotel expenses of these men at a meeting once a year. The suggestion seems to have borne fruit, for, the following month, definite arrangements were made looking to the formation of a national cooperative. On July 9, 1940 Baum said that he had obtained approval of the plan from John Hartford and Byoir. He suggested a nonprofit corporation controlled by shippers to whom Acco, handling sales to trade customers, would refund its earnings in excess of the expense of handling the business. This, he thought, would materially increase Acco's outside business. He issued letters to shippers, recalling the important role played by Acco in distribution of produce, Acco's service to producers in saving distribution costs, resulting in increased consumption and more profitable return for all. He asserted that this would be a "further advanced step in our company's operation," whereby, said he, "the services now being rendered by the company would be extended appreciably" and suggested a meeting of shippers to consider the idea, at Acco's expense. He summoned a smaller group as a steering committee, consisting of nine leading shippers in various parts of the country with whom Acco had frequently dealt, asking them to attend a meeting preliminary to the one proposed in the first letter. At the same time he wrote to Acco field men sending them a copy of the first letter and a list of those to whom it had been mailed. Counsel advised Baum that the chief problem revolved around the type of organization to be set up; that, in a trade association limited to cooperation of shippers, wherein Acco merely performed the mechanical function of repaying Acco profits back to cooperative members, there was nothing in restraint of trade but that a possible violation might arise if Acco secured a monopoly or near monopoly. Toolin wrote on July 24, 1940 that Baum's plan would "spread like wildfire" but inquired "is there any danger of this movement eventually reaching the point where

the Commission Company would be handling so much business that they might be accused of becoming a monopoly?" John Hartford also had some reservation, for he thought the plan should have "the approval of the Department of Agriculture, * * * and not be in conflict with any regulation or law." Baum and Byoir consulted the Department of Agriculture and the Under-secretary advised them that the cooperative must be "independent, grower controlled."

Until then Baum had referred to the program as an advanced step in his company's progress and had suggested procedures to his field men. Evidence is lacking that any shipper had suggested such an organization or was aware of the proposal, but, following the expressions of doubt above enumerated, Baum's tone changed; he began to talk of an independent organization. On August 8th, he explained that "the shippers" would form an organization which would in turn contract with Acco for sale of merchandise to trade customers, and that Acco's net profits from the sales would be refunded to the organization; that the plan would return a greater share of sales prices to producers and be equally advantageous to Acco in increase of volume. He declared that the conference was the shippers', not Acco's, although the latter was paying the expense. French called for election of a chairman. Parrish, an Acco co-operative supplier and at times its employee, nominated McDaniel, an old customer of Acco. Nothing in the record discloses improper word or action by McDaniel but he was at all times friendly with Acco and sold it the merchandise of Mutual Orange Distributors Association. His election was unanimous. He stated that Baum had acted for shippers in calling the meeting; that "after the organization is set up, we should see if we cannot get an effective merchandising organization to handle * * * products for us"; and that "in a nutshell, we believe the Atlantic Commission Company * * * should be willing to forego any profit which it might make from its operations" if it could handle the merchandise. Snively, another supplier of Acco, said that Acco "will give us this service at cost and is prepared to give us 'adequate distribution."

Three shippers expressed doubt as to the feasibility of the scheme of operation, one suggesting that it might inspire resentment on the part of smaller produce buyers; another inquiring what would happen to A & P's competitors on the buying market. McDaniel replied that the cooperative would not be the shippers exclusive selling agency and that economic pressure probably would weed out those who were most inefficient. Byoir said that the problem was whether producers, "handling probably 30 or 40% of all the fruits and vegetables produced and marketed in the country, should form one great cooperative for the purpose of improving the machinery of distribution," that "any opponent to such an organization would be a damn fool"; that if the distributors formed an organization completely independent of A & P, the Hartfords would go further than anyone would expect them to, to make their machinery available; that Acco was eager to dispose of its profits from its trade sales and at the same time anxious to increase its volume in order to reduce its expense on A & P merchandise and motivated partly by a desire to make seven million farm friends to assist A & P in fighting off attacks of those who resented its low pricing policies. Baum said that Acco was handling produce at a cost of $16 a car; that the program would mean reimbursement to the cooperative of $7 or $8 a car. "However," said he, "that is an estimate, no definite promise." A delegation then consulted John Hartford, who stated that he was willing to give the cooperative profits on Acco's trade sales, if it was legal to do so.

Despite the expressed independence of the shippers, the members of the final organization committee were selected by Baum. He asked his field men to confer with suggested members and advise them that the chairman had asked Acco to interview them, inasmuch as Acco was in better position to make recommendations as to who they should be. He wrote McDaniel that he was enclosing suggested representative personnel list for the organiza-

tion meeting and that he desired McDaniel to communicate with those on the list who agreed to serve. After he received Baum's list, McDaniel sent out letters. Baum wrote some other shippers asking them to attend. He described the August 9th meeting as one where "we condescended to allow these groups to set up a cooperative organization." At the organization meeting Snively was chairman, and took a committee to the Secretary of Agriculture, who told the delegation that he could not grant a permit or license. The attendants considered various formalities and employed an attorney from the Florida Citrus Exchange.

Baum attended the meeting, but says he attended none thereafter. He received, October 30th, a wire from John Hartford advising him to have no connection with the movement until he saw Hartford. Baum replied that he would comply with the request. Thereafter, though the new organization had its own counsel, it was made up of people selected by Baum, who frequently advised with him and his superiors concerning their actions. When it was reported to Hartford that Secretary Wickard had advised that he could give no approval, according to Snively, Hartford said that "they were not going to stick their necks out and tell us to go ahead" but that if the arrangement could be approved by A & P's counsel, he would "permit us to go ahead." The members of the executive committee frequently consulted Baum, advised other members to consult him and were in frequent communication with him and Byoir. The latter prepared a statement addressed to the growers that "the Atlantic Commission Company will make its facilities available to us on a non-profit basis" and that others might also do so.

John Hartford, evidently disturbed by developments, on December 5th, wrote Baum that rumors persisted that Acco and A & P were still supporting the cooperative and that he was making it clear that any plan must have the approval of the government and be equally available to all other outlets. But after receipt of this letter Baum and Snively prepared press releases concerning the cooperatives for produce journals.

Baum received a report from King on the membership drive in South Texas. He set Acco's annual meeting on April 3rd and 4th and the shippers' meeting on April 5th. On March 14, 1941 he wrote his field executives to submit a list of men to be invited to the shippers' meeting, saying that he would defray hotel expenses. When a shipper complained that he understood that he could not deal with Acco unless he joined the cooperative, Baum replied that he regretted that such an "insinuation" had been made, but that "at the same time we feel it would be beneficial for all shippers and large growers to become members of their own organization." He suggested that McDaniel and Snively meet him in Washington prior to the shippers' meeting.

King, referring to the criticism of the cooperative's so-called alliance with and control by Acco, stated that "although Acco had perhaps been in a position to have their influence upon this thing," it had never "suggested control" though "they perhaps expected friendship." He reported that, under a contract with Acco in preparation, the cooperatives would collect Acco's trade brokerage from its members, retaining a fixed portion of approximately 20%; that Acco would not pay 20% on trade sales not made on a brokerage basis but merchandised by Acco but would pay $2.50 per car. King testified that the meeting did not discuss distributing contracts with other chains but that he had found others willing to discuss cooperation.

On April 16th Baum forwarded to the organization a copy of the proposed contract with a brokerage schedule and letters to the members confirming the brokerage schedule. Counsel for A & P had insisted on avowal of availability of similar contracts to others and deletion of the provision for payments on merchandised cars. He said that if the cooperative honestly intended to enter into similar arrangements with others, much of the danger could be avoided by withholding signing the contract until others had signed and that an important consideration was that the plan might invite an investigation into the entire subject of Acco's buying practices.

King apparently continued to feel that Acco should fulfill its original promise to

give the cooperative the profit on its trade sales, saying that the contract "does not constitute a substantial compliance with the original promise of Acco" and adding "as you know, they expressed repeatedly and publicly a willingness to give this association all their profit on trade sales." Acco eventually agreed to pay the cooperative 1% on Acco's commission sales.

It was again suggested that the committee contact other selected brokers and, apparently, the cooperative made two contracts with others. One was Deegan, a small dealer who afterwards came into the employ of Acco. Baum, himself, contacted a broker in New Orleans on behalf of the cooperative. On June 9, 1941, a shipper wrote Baum saying that he could not see "much advantage to be derived except for the tie-in with Acco on trade business." Baum advised him to join. The intimate contact between Baum and his selected members of the organization committee and officials of the cooperative continued until the contract was cancelled in February, 1942, as a result of a statement by John Hartford that, owing to legal complications, A & P and Acco "could not help the cooperative any more." However, upon termination, A & P gave the cooperative unconditionally $35,000. Thereafter the cooperative became a trade association. However, Acco still had its contact committees, its friendly committees and officers of the cooperative and its close relationship with various smaller cooperatives.

Defendants claim that nothing improper was done by Acco or A & P but that everything transpiring was inspired by a desire to help growers eliminate middleman cost and reduce prices to consumers. They stress the fact that no member of any cooperative or other organization was required to sell any merchandise to or through Acco. They admit that Public Relations counsel for A & P did encourage growers to create organizations but deny that Acco dominated them, relying upon evidence that Acco said at meetings of the growers, that under no circumstances would Acco have anything to do with operation or management of the supercooperative. They point to the fact that Baum was expressly cautioned by Hartford against exercising or attempting to exercise any control of or influence over the cooperative.

I have gone somewhat into detail as to the activities of Acco in the negotiations and transactions with the national supercooperative not because those matters standing alone necessarily amount to violation of the anti-trust law but, primarily, to show, what I think is beyond question, the dominating position of Acco, principally through Baum, in smaller cooperatives and with the attempted national cooperative. It may well be that this intimate relationship, this pragmatic control of producer organizations was not improper standing alone; and I have no doubt that the various cooperatives themselves were honestly striving to help shippers and, indeed, such undoubtedly was one of the purposes of A & P and Acco. The difficulty growing out of all this, when considered with all other circumstances, lies in the fact that, in the end, by the use of its integrated power and control, defendants purchased merchandise at prices that they would not otherwise have obtained, at prices less than those of competitors, with a resulting handicap to competitors. But even this, again, might not, standing alone, have constituted violation of the law. There is the further fact that Acco, in its predominating position in the produce industry, acting as a buyers' broker, a sales broker, a direct buyer for A & P, through its intimate relationship, was realizing profits for A & P as a result of its inconsistent legal positions. Acco owed one employer a duty to get all that it could for the seller and to another the duty to buy merchandise from the seller as cheaply as possible, with choice of quality. Add to this the undisputed fact that the earnings and profits of Acco received as buyer broker or as seller broker or otherwise eventually became a part of the profit of A & P and eventually a substantial help to the local stores to supplement their net earnings.[2] Competing retailers were confronted with sales prices and profit rates added to, supplemented and increased

---

[2] Davidson said that the profits of "Acco are those of the Tea Company and are to be absorbed by the units in which Acco is operating."

by the profits of A & P upon merchandise sold to those competing retailers. The resulting restraint of competition and commerce seems to me obvious.

### Meeting Competition.

The Government speaks at length of red ink campaigns, low gross profit rates and price wars, claiming that at times, prices were so lowered as to bring events into accepted definitions of price wars. It claims also proof of conduct of so-called price wars in one unit or in one division, through the means of reduction of profit rates with the idea of increasing sales and reimbursement of units or divisions for losses or small profits by payments from headquarters. It insists that reimbursements from headquarters enabled A & P as retailer to cut prices and injure competition.

Defendants insist that the evidence reflects no concerted plan to select areas for special treatment for the purpose of injuring competition, i. e., for the purpose of injuring or destroying competitors by cutting prices in one area lower than those elsewhere until control of the retail business in that area has been obtained and offsetting the losses or reduction in profit from such price lowering by the use of income from other areas and from nonretail operations. They offered evidence to show that the primary reason why stores lost money was not low prices but poor management, lack of volume and other factors having nothing to do with prices and that, although there were some losing supermarkets, the majority of unprofitable stores were small regular stores where prices were higher than in the supermarkets. They argue that the fact that every unit always had a number of red stores makes it unrealistic to conclude that "selected areas" were thrown into the red systematically for the purpose of "destroying competition"; and insist that A & P had strong competition everywhere and that there is no evidence that it unreasonably interfered with competition or obtained a monopoly anywhere. They contend that the only logical inference to be drawn from the evidence is that stores were in the red contrary to the desires and efforts of defendants. There is no question but that aggressive campaigns were waged or that certain units and certain divisions were from time to time favored by planned low gross profit rates and low prices with the purpose of increasing volume of sales. Such efforts were, if they succeeded, at the expense of competitors, but this says the defense, was merely an economic incidental not intended to injure competition.

Perhaps it is well to examine some of the facts. Units and divisions, whether they make a profit or a loss from actual retail operation, receive allotments of subsidiary profits, headquarters and local advertising allowances. In those areas operating at a retail profit, the allocation of outside profit increases the total earnings. In those operating at a retail loss, the outside profits and allowances constitute reimbursement for losses incurred. For example, in 1942 the southern division, while aiming at a net profit return of 2% on sales, was actually earning only .0022, its remaining profit being derived from headquarters. and advertising allowances. The Albany unit in 1941 reported a net profit of $425,-014, including allocated subsidiary profits. $244,741, and advertising allowances $161,-700, leaving an actual net operating profit of $18,000. The stock gains in the unit for that year amounted to $47,000, which, when deducted from profits, results in the astonishing actual retail operation of the entire unit at a net loss of $28,999.

In the central western division, Toledo operated at a loss from 1932 to 1938 inclusive; Indianapolis in all the same years except 1936; Detroit in the years from 1932 to 1937 inclusive; Cincinnati from 1932 to 1937 inclusive. In each of these units aggressive sales campaigns were conducted at low gross profit rates. In 1936 it was decided that all units in the division should operate with a profit except Detroit,. which was permitted to plan operations at a loss of $3,000 per week for 20 weeks. In 1935 the executive committee received from headquarters approval to continue the low gross profit policy at Cincinnati and Louisville, and an appropriation of $52,000 for Louisville and $14,950 for Cincinnati was approved. Earlier the same division had.

stated "we would be in position to plough back into the Cincinnati territory whatever is necessary in the way of a drastic sales campaign in order to bring that unit up to a par with the balance of the division." The policy was expressed by Hartford and Toolin as follows: "experience * * * has always shown that an aggressive sales policy with a steady increase in volume of business turns the expense rate in the right direction and, with the generous attitude of headquarters giving us permission to, literally speaking, swap dollars, the organization should be imbued with a new spirit of confidence." Toolin wrote May 28, 1941 to Indianapolis "we were successful in staying off the other competitor there whose days I now think are numbered." On cross-examination he stated that this was a figure of speech.

Boston operated at a loss from 1934 to 1941; Providence from 1934 to 1940. Other units showed similar losses. Hartford, attending a meeting of the Advisory Board, said "now is the time for us to go after business more aggressively than ever before * * * even though to accomplish this means to substantially cut into the rate of return on the invested capital." In the New England division, it was the Hartfords' feeling in '34 that Davidson should "go after business very aggressively with" alteration of profit rates from time to time. Conditions being unsatisfactory, in November 1934, Byrnes was put in control of the division. He promptly cut the gross profit rate to an operating loss. The treasurer of First National Stores, A & P's principal competitor in the division, testified that after Byrnes came, A & P instituted lower prices in many items, including meats. Losses continued through 1940. The underlying thought was expressed by Byrnes: "When you consider our Quaker Maid allowance, and the advertising money that the Purchasing Department is able to collect for us each thirteen weeks, you will readily see that this promise of $73,000 net profit actually provides for us being in red on our weekly operations."

In the southern division at times extremely low gross profit rates were arbitrarily set without regard to the expense rate, frequently causing the stores to operate at a loss. Price zones were established carrying varied prices and stores shuffled from zone to zone, as the guiding officials deemed best. Carlton said: "where stores need special attention because of unusually active competition * * * the stores in those towns should be put into a special zone and given the benefit of lower than average prices. In other towns, * * * a little better gross profit rate can be obtained, with the result that the total for the unit will be in line with the program." Smith expressed concern: "I sometimes wonder if 11% and 12% gross profit rates will not at some time in the future cause us embarrassment. * * * when they are so much lower than competition I am just wondering if this does not give the 'sharp-shooters', * * * an opportunity to make a target of us. * * * some of our produce departments and meat departments are operated at substantial losses." Smith commented "Undoubtedly there will be some red figures until you have been able to build up your sales and reduce your expenses to offset the low gross. It is an absolute program, however, and must be accomplished." At times buying brigades were formed to buy merchandise from competitors at special prices offered. Thus Morgan, writing an A & P retail manager said: "Your action in organizing a 'buying brigade' to purchase below cost specials was most excellent * * * A few weeks of this and we doubt if you will have much trouble over below cost selling on the part of your competitors." And still later: "* * * turn on the most heat in the Houston stores. We have already done this to some extent as indicated by the returns for last week which ran .1149, .1177 and .1101 respectively, for the three Houston supers." Morgan's proposal applied to the locality where Carlton had suggested to Morgan that he might be able to sell groceries with a gross profit rate of .1000 or .1050; it seems obvious that when he used the expression "turning on the heat" Carlton meant lowering the gross profit rate.

Black, in charge of Birmingham from 1932 to 1939, increased volume substantially. Some methods employed were low gross profit rates resulting in sales below

cost, brigades to buy merchandise in competitors' stores on sale days, shuffling stores from zone to zone, sacrifice of profits in selected areas, and sale of meats and produce below cost. It was suggested that certain stores buy as many of "these two items from your competitors as possible." When Hartford inquired of Adams at the presidents' meeting as to what plans he had made to carry out the program, Adams replied: "Some competitor may * * * make a drive for business, cutting the gross and reducing prices, where we, to protect ourselves, would have to follow suit. But if this were done in one part of the division, some other unit should be able to pick up the loss." This he explained, on the witness stand, as follows: "The loss—well they would have predicted figures also, and would make a better profit than they predicted, a better operating profit and they would take care of the less profit that the other unit sustained, and we would get the total predicted profit for the division." Black said in 1936: "even though we have to operate with no profit, it is necessary to hold our volume. * * * You know there are times when we can operate with a big gross and there are times when we must meet competitive conditions." Concerning the shifting of stores from one zone to another Deese testified: "Well, in certain zones, they (competitors), probably would be selling staples very, very cheap, and those zones were set up to meet that competition in that particular locality. If there was a particular zone where the volume of A & P was low and competition keen, we would reduce certain items in that zone so that it would not effect a price change over the entire system. That works both ways. They could advance prices in certain zones where they felt competition was weak, and they hadn't much competition * * *." Apparently zoning at times had nothing to do with differentials in transportation and such differentials were not the underlying cause for different zones.

From 1927 to 1939, Crocker was in charge at Dallas. In August 1939 Black was transferred from Birmingham to Dallas. Crocker's sales in Dallas were then about $12,200,000. Crocker testified he was released because, as the president of the division told him, "he was not ruthless enough." This was denied. After Black's arrival again we find low gross profit rates at various points and A & P buying brigades. In December, 1939, Adams wrote Smith that he was surprised to see the very low gross at Dallas for the week of December 2; that heavy reductions must have been made, and asked what was happening. Smith replied that a new store had been opened at Wichita Falls, saying: "Then, too, Safeway, * * * is beginning to feel the effect of our increased business in Dallas and, as a consequence, have made some price reductions. * * * Mr. Black a few days ago stated that he was proud of the showing * * * I am going to permit him to give Safeway a run for their money." Adams cautioned Smith to keep an eye on Black and not allow the gross profit rate to get out of hand. He anticipated no criticism unless it should become "unreasonably low" but, he did not think "we should have to give our produce away." Black reported: "The wives * * * were formed into a brigade * * * to purchase below cost specials of competition, * * * When the manager or the clerk tries to do this, the competitor's store usually refuses to sell them, but in the case of the wives, they can not identify them from their regular customers." Adams reported: "Mr. George Hartford gave me a pretty rough time on Houston * * * spent a lot of time on Dallas. * * * Mr. John and Mr. George * * * would like to see you operating * * * on a 12% gross * * * they would not care how much money we lost as long as we kept our gross profit down. * * * I told Mr. John and Mr. George that you felt we could go too low on gross profit in the South, that you probably would not believe that opening five stores in Chattanooga would hurt us as much in a public relations way as getting our gross down to 12% in some places where it would make competition feel that we were trying to put them out of business." John Hartford testified that Dallas had operated at a loss, but that as soon as it could get on a proper operating basis "we would have every reason to believe we would get the volume that would take care of it." Black

reported concerning the second quarter at the Greenville store in 1941: "You will notice that these figures reveal a small profit * * * When you consider the kick in at the end of the year, I believe you will agree that we have at last achieved a fine result. I would appreciate your asking Mr. Adams to please take this store off his board."

In Dallas, a competitor, Clark, had a combination store one-half block from an A & P store. He testified that A & P's low prices on national brands were about 1¢ above his cost. His sales declined from $95,000 in 1938 to $75,000 in 1941, net income falling to $1,350 in 1941; in 1942 he went into receivership. A & P had closed its store near him prior to the receivership, but had opened a supermarket 4½ blocks away. Clark testified that his credit losses, which amounted to one-half of 1% of his sales, were not the cause of his failure.

Culwell, owner of a Clover Farm store located next door to an A & P store, testified that he compared A & P's advertised prices with his own and that A & P conducted every day sales at retail prices below his cost. His sales in 1937 were $73,-000, profit $4,000; his sales in 1938 $65,-000, his profit $3,000; 1939 sales were $62,-000, net profit $2,000; 1940, $60,000, net profit $2,000; 1941, $59,000, net profit $1,100. In June 1942 A & P moved its neighboring store fourteen blocks away. Culwell's business jumped from $59,000 in 1941 to $80,000 in 1942, net profit to $3,000.

In the central division Buffalo operated at a loss in 1937, 1938 and 1939; Cleveland in 1932 and 1934 and, if we do not consider inventory gains, in 1933, 1935, 1936, 1937 and 1939. The situations at Columbus, Youngstown and Altoona were similar in 1932. Here, too, there was store zoning for competitive purposes. Indeed, probably the most striking instances are found in this division. In Pittsburgh, in 1939, an A & P store was placed in a new zone allowing it a lower price classification in order to meet competition. Reduction in prices was made the day before the competitor's Giant Eagle's opening. A & P lowered the gross profit rate in markets adjacent to the Streamline Markets, recouping losses with profits from other division markets

not in proximity to Streamline and from profits passed on from headquarters. An attorney brought this to the attention of John Hartford, threatening suit if it continued, saying: "On Friday, Mr. King, Vice President of your company and head of the local unit, called on two executives of the Streamline Markets in one of their new stores * * * and in a loud voice, publicly, before the employees and customers, threatened to commence a campaign to bring about the financial ruin of Streamline Markets"; that King boasted of "past achievement of financial ruin" to other competitors; and said that he was going to cut the meat and produce to cost in A & P stores nearest the Streamline Markets; that he would "put a store in Kittanning that will take care of that store of yours. I will put one in Butler right opposite your store that will finish that store. I am going to turn all my guns on you." Rezoning followed. "In the case of Streamline we set up a special price zone called zone 'M.' We zoned all of the Streamline points, every one of them, and the prices in the zone 'M' were lower than in any of our regular supermarket zones." Various other acts were attributed to King. Hartford ordered an investigation. He concluded that the facts had been properly reported, and counsel announced that "A & P could better afford the loss of $500,000 in sales than to let the Streamline story be made public, and a recurrence of such a thing would simply be ruinous beyond measure." Hartford attempted to correct the situation, but King continued in the employment of the company. As to the King incident, defendants insist that what King did was without the authority of the executive heads and cite evidence that Hartford asked for King's resignation and testimony that, pursuant to A & P's counsel's appeal to Mr. Hartford to reconsider, King was allowed to remain with the company.

With regard to an Oberlin store Hartford commented "It rather looks as if this store was placed in this zone shortly after Mr. Keller opened his grocery store. * * * and rather has an appearance of being planned that way." Keller had complained and Hartford said "I feel * * * that

we did exactly what Mr. Keller described in his letter as having taken place."

Defendants contend that all they did amounted merely to steps taken to meet competition and not to injure it. They point to records of minutes reciting that the practice of low cost selling is undesirable. Thus, it was said on April 9, 1936: "We must not by word or deed let the impression get abroad that we are at any time attempting to put anyone out of business. One or two instances of this have come to our attention and represent something that is strictly contrary to the company's policies"; and "a recent instance of the flagrant violation of the company's policy in respect to the strict observance of fair trade practices was discussed. In this case a former manager had set up in business for himself and was harassed by our local supervision as if in retaliation for leaving us and going into business as a competitor. It is important that our supervision thoroughly understand the company's policy of strict adherence to fair competitive practices and of non-interference with a competitor's business."

There were zones within zones. A 1940 review of the Pittsburgh unit reflected striking inconsistency in this respect. Some combination stores were carrying super-market prices on all items; others on produce and meats only and still others on meats alone. Twenty-five straight grocery stores were quoting grocery retail prices higher than those in regular service stores. Four of seven straight grocery stores had higher prices than the other three. The Government cites certain evidence as proof of stores closing as a result of A & P's campaigns. Thus it was reported from Monongahela, where stores closed: "This was an old competitor of ours now down to one store."

For two years after 1938 the Atlantic division was operated at a loss, resulting in an increase in volume from $108,000,000 to $151,000,000 in 1941; in that year it realized a profit. During the years when losses were planned, millions of dollars in headquarters allowances and subsidiary profits were received. Richmond had losses in 1938 and 1940; Baltimore from 1937 to 1939 inclusive; Philadelphia from 1934 to 1941 inclusive. The division was allotted a gross profit rate below the cost of doing business. John Hartford proposed that supermarkets operate at a gross profit rate of not to exceed 10% even though the expense rate in the division for 1938 was .1775. Hodgson said: " * * * it might be necessary for us to operate unprofitably for several weeks. * * * reducing our line of 10% several weeks prior to the time the competitor plans to open so that people in the community will be impressed with our low prices and will continue to shop with us after the competitor has opened shop." On January 17, 1939 the executive board met to determine whether the results justified continuation of the policy, as losses had been heavy, and concluded: "were we to retrench * * * competitors would very quickly resume an offensive position which undoubtedly would seriously retard further progress. It is preferred to keep competitors in a defensive position, so that we continue to maintain our merchandising leadership." In Scranton, Washington, Endicott, Kingston and Stroudsburg, the progam was continued in anticipation of opening competing stores. In Endicott, the gross profit on meat was .0025 in one opening week and the accumulated meat gross in Scranton up to March, 1939, was .0842. Leach advised Gallagher: "It was decided to subsidize our territory * * * and allow for a loss in the Atlantic division of $11,000 per week during the fiscal year 1939. * * * the loss does not include the .0010 headquarters interest credit or the profit distribution which is estimated at .0131. * * * The Altantic division, as you will note, is expected to show about a .0046 loss weekly but, inclusive of overages and distributions, a profit of .0119 will be realized." The $11,000 weekly loss was allocated as follows: "Baltimore, $500; Philadelphia, $6,500; Richmond, $500; and Washington, $6,000. These losses, totaling $13,500 were to be offset by a profit of $2,500 in Scranton, or a net loss of $11,000." In Allentown one store showed a gross profit rate of 10% and an expense rate of .1750; another a gross profit rate of .1037, and expense rate of .1480; in Easton one a rate of .1219 and expense rate of .1764; in Richmond in

July, 1939, a rate of .1161 and expense rate of .1351.

In 1939 the division lost $108,000 as compared with a net profit of $52,000 in 1938. When a competitor in Richmond, a former A & P manager, opened a store, a special six weeks competitive campaign was inaugurated by A & P. Divisional headquarters said: "the hotter we can make our program, the quicker this outfit will realize that they have no place in the supermarket business in Richmond." Concerning the opening of Food Fair, another competitor, Hodgson said: "No doubt you * * * have given your Super Markets competitive with those of Food Fair * * * the kind of price ammunition they needed to keep the competitor from doing any damage. Whenever we get wind of the opening of one of their stores now we set up a special program three weeks ahead of time, so that by the time they are ready to open their doors for business there isn't very much they can do to entice trade from us. Maybe we are not living up to the letter of the law with regard to company policy in this respect, but we would much prefer to be criticized for digressing a little from the policy than we would about competitors having taken our business." On the witness stand Hodgson testified that his program of eliminating competition only meant strengthening supermarkets with attractions and sales of meat, groceries and produce at a lower rate in that store than in others. The aim of Richmond was, if possible, an even break or a slight operating profit, "relying on subsidiary profits to return us a modest net." Many stores were operating meat departments at a heavy loss. At Plymouth the meat gross profit was .0081 with an expense rate of .1601. In Harrisburg, Va., the meat gross .0266 the expense rate .2122. In another city the gross loss on meat was .0268 and profit on produce .0402. Leach whote Gallagher: "I feel that the meats have been an excellent thing to help us get volume, and if a store is doing a good job, I do not have any objection to the meat department being somewhat in red." At a meeting in Richmond in 1941, it was said: "Nothing should be left undone to defeat competitors' plans to share in our business in these towns. * * * Superintendents are asked to notify the Sales Department sufficiently in advance of such openings in order that competition may have no opportunity to affect our business." In July, 1941, Hodgson advised Vice President Bieber: "You have two weapons at your disposal to combat their merchandising below cost and those two so-called weapons are meats and produce. The hotter you make your prices on these lines the quicker you'll discourage Safeway's development."

Hartford advised, concerning New England and Atlantic, "that these two divisions * * * carry on more aggressive sales policies by establishing their 1940 profit programs at the break-even point." Adams said: "he would much prefer to see the 1940 program exceeded in sales even though * * * we might experience some little operating loss." And at the divisional presidents' meeting December 17, 1940, it was decided that "the New England and Altantic divisions could cut their gross to .1100 since these are the divisions which most need this help in building their volume * * * other divisions will operate at a .1156 gross figure. The result will be a rate of .1142 for all divisions combined." When cross-examined as to whether this meant that units would operate at a loss, Adams answered that it did. Upon redirect examination he said "we had been losing sales * * * and we knew the only way to get them back was to go after the volume." When asked by what means he proposed to increase the volume, he said by "a lower gross profit." He finally testified that the program did not mean that the division was to operate at a loss but "to regain our advantage in sales which would reduce expenses and get back into the business and make some profit." Unfortunately it is difficult to reconcile his statements on cross-examination and redirect.

At a meeting in September, 1937, Byrnes reported that the Hartfords had expressed an opinion that a very aggressive sales policy should be established in the Eastern division. In 1939 Shea, vice president, wrote McCarthy enclosing a weekly list of special prices showing four items sold at no profit and others at an extremely low gross profit.

The next week five were sold without profit. Concerning a competitor on January 3, 1940, a sales manager wrote: "the Food Fair and the Big Bear were going to move out of North Bergen, thought you would be interested in knowing that thru confidential sources we understand that the Food Fair feels they are very much bottled up * * *. As soon as we can open in Clifton * * * we should be able to give them a clipping there." On October 23, 1940, Garden City issued a list of special prices in three self-service stores. On six listed articles there was no profit; on other items the profit substantially lower than regularly. These low prices were extended to A & P stores "because of the opening of Dan's Market." On October 23, 1940, other items were added at a low gross profit. These prices were extended for another week and, on November 28, 1940, had been allowed eight stores "due to the opening of a new supermarket." Carlton wrote Byrnes: "Of course, there is no doubt about the effect of a continuous low price policy on our competition. * * * I think if we maintain our present gross profit policy, we would have to expect to see quite a few weeks in red." Garden City thought that the low gross profit policy should be continued, "the length of time depending entirely upon the results which we are able to achieve." The division reported for 1941 a net profit of $4,366,790 but of this $3,388,965 was derived from subsidiary profits and advertising allowances.

In the middle western division the record can not be vitally differentiated from that relating to divisions previously discussed. The subsidiary profits distributed to this division in 1935 amounted to $558,000. The division then had 152 stores which had lost money for two years, 84 of them for four years, the losses for four years amounting to $485,786. Apparently some 43% of the division's profit in 1937 came from retails, 28% from headquarters allowances and 29% from subsidiary profits. The amount of the latter sent the division was $704,617. In 1937 John Hartford emphasized the necessity of regaining volume and the presidents' meeting recommended a decrease in gross profit for 1939 of 1%. "There was considerable discussion as to how we would distribute the 1% reduction in gross to the units. It was agreed that in certain territories it would be unwise to reduce a large number of items as our prices are already well in line. However, there are territories which need medicine badly and an aggressive campaign of lowering the price of our shelf commodities should retrieve volume lost." In the first 10 weeks of 1938, 19 supermarkets operated in the red, the gross profit rate being 2% lower than the expense rate. Here, too, we find creation of zones and shifting of stores from zone to zone with varied gross profit rates, to meet competition. The division aimed at a goal of over 20% of the business in cities of over 10,000 population in which it operated.

At Springfield, Mo., gross profit rate was .0750. The manager wrote: "The Safeway superintendent * * * wanted to know how we ran our prices so low * * * He said we were selling much merchandise cheaper than they could buy it." This situation was discussed June 27, 1940: "Competition met the Super Market prices efficiently to prevent our procuring anticipated volume. In an attempt to secure business we put our gross profit too low and spent considerable amounts of money on advertising. Still we did not secure the business. It was decided, therefore, that in no case in the future will we lower our gross profit below 10%." Defendants insist that A & P failed to succeed at Springfield and closed its store because of the competition of Safeway. They point to other instances where A & P failed to succeed and closed stores. Since 1933 A & P has withdrawn from over 1,000 towns and has opened in only 140 new towns. They argue that there is no instance where A & P drove any competitor out of business and that the evidence of competitors' store openings and closings proves nothing. They admit that, in determining the overall profit of A & P, the profit and loss account was made up by placing in it all income and deducting from it all expenses, including income and expenses from losing as well as successful stores. To this extent, they agree, income from profitable stores offsets the losses from unsuccessful stores. But, they aver, this is one of the incidents

of any business operating more than one unit.

December 4, 1940 Chicago requested permission to operate meat departments at three points, "at a 5% gross for the next four or six weeks in view of competitive conditions." In November, 1941, St. Louis, which supplied stores within the eastern district of Illinois, instituted a special price zone for problem stores in which they placed Murphysboro, saying: "While Cape Girardeau and Murphysboro are new stores and will probably develop satisfactorily, we should, for the present, arrange to group stores with an unsatisfactory volume in a special category for special treatment." This, a combination special development store, replaced in 1941 a straight grocery store and operated for the first year on a gross profit rate of 10½%. Volume did not develop and defendants accordingly reduced the gross profit rate to .0806 in the second quarter of 1942, resulting in a loss of $2185. Losses continued through the fourth quarter. Defendants were operating in Carbondale, West Frankfort, Mattoon and Centralia, but the stores there received no such special treatment. Carbondale first had a gross profit rate of .1078 and then .1283 and operated profitably. Similar profitable operations occurred in West Frankfort, Mattoon and Centralia; in each volume grew and defendants felt no necessity to reduce the gross profit rate. The final profit and loss statement did show a loss in some towns and a profit in others, but defendants say the losses were not planned for the purpose of unduly injuring or destroying competition. The special treatment accorded Murphysboro is strongly persuasive that defendants deliberately took losses to increase the volume of sales. Defendants say there is no significance in any of this evidence and insist that they may sell their merchandise at different prices and indeed, give it away. Of course, as a legal proposition, this is true. Defendants insist further that, as business grows, expense rates go up and "if you keep on raising gross profit rate, eventually one has to go out of business," that by reducing prices "we get enough additional business to reduce the expense rate and thus develop those stores to a proper place"; and that there was no intent to injure competition.

## Fixing Prices with Competitors or Suppliers.

The Government charges that defendants have used their dominant position advantage to injure competition in selected trade areas by combining with manufacturers of food products to fix and maintain prices. With respect to alleged retail price maintenance, defendants depend upon such cases as United States v. Colgate, 250 U.S. 300, 39 S.Ct. 465, 63 S.Ct. 992, 7 A.L.R. 443. The evidence really falls under three headings, namely; alleged agreements with competitors; alleged agreements with manufacturers and suppliers; and membership in food distributors associations. Beyond question there were agreements or understandings on prices in certain local territories. One such was between A & P and the American Stores at Scranton in 1939, one between A & P and Hill Grocery Company at Montgomery and another between A & P and Grant Union at Scranton. At Miami A & P was a participant in the activities of the Miami Retail Grocers Association. Lists suggesting prices for retail were distributed and brought to the attention of A & P divisional officers. Prices quoted by A & P were generally in line with those suggested.

Closely connected with this phase of evidence are the activities of local agencies of A & P in connection with trade associations. Thus Richmond was a member of an organization enforcing the Virginia Unfair Sales Act, Code Va.1942, § 1463(1) et seq., until March 1941 and made contributions to its expense of operation. In Maryland, Peltz of the Baltimore Sales Department, was treasurer of Maryland Food Council, which wrongfully assumed the right to enforce the Maryland statute and to prevent sales of articles at cost. Though the law was declared unconstitutional, the association continued its activities over the protest of counsel for defendants. A & P was a member of the Food Distributors Association of Philadelphia formed in 1935 after invalidation of the National Industrial Recovery Act by the

Supreme Court. The association engaged in efforts to maintain prices, to eliminate premiums and to enforce invoice mark-ups and retained an attorney in charge of policing. The Pennsylvania law having been declared unconstitutional in October, 1939, the association adopted a policy of a markup of 5% above cost on meats and produce.

Hartford thought that these matters should be left to the local organizations, but counsel wrote that the price lists went much further than the law permitted and warned against A & P becoming involved in a violation of the anti-trust act. In 1940 he said: "Sales-below-cost laws are not inherently bad. * * * The difficulty lies in the misuse of these laws by trade groups of wholesalers and retailers who seek to fix prices arbitrarily. The customary procedure of these groups is to establish an arbitrary mark-up under color of a 'cost survey' and seek to force it down the throats of all retailers by threats of expensive and long drawn out litigation." I think there is no question that the declared general policy of the company was against participation in organizations looking to a markup for fixing retail prices in pursuance of state laws enacted for the purpose of promoting so-called "fair trade." Thus, in 1939 the minutes of the Middle Western division recite that "We have had several requests recently from different food groups to attend meetings at which they propose to discuss retail markups. It was felt that we should refrain from participating in these meetings, as we do not want to be part of any arrangement which has to do with the fixing of retail prices." Counsel Ewing testified that the policy was that under no circumstances should there be agreement or understanding with respect to sales prices and that A & P should belong to no association, organization or council which in its operations, whatever they might be, had to do with fixing such prices. On September 23, 1937, concerning a letter received about a trade association in the state of Minnesota, regarding the dangers of concerted action, he quoted a decision of the Supreme Court to the effect that an act harmless when done by one may become a public wrong when done by many and concluded that however apparently innocent might be the actions of this trade association, he could readily anticipate unpleasant possibilities. On November 18, 1938, he wrote: "This thing of banding together to control or maintain prices is a very dangerous venture and we are keeping out of associations having such purposes." Similar expressions are contained in letters of later dates.

On April 8, 1941, at a divisional presidents' meeting in New York a resolution was adopted that the company refrain from participating in the activities of any non-Governmental organizations which discuss or are concerned with fixing retail food prices. A similar resolution was adopted by the Central Western division on April 15, 1941. Other representatives expressed similar ideas. Counsel Feldman testified about A & P bringing an injunction suit in Minnesota where the state law was held invalid. Great Atlantic & Pacific Tea Co. v. Ervin, D.C., 23 F.Supp. 70. The company was interested in another suit in California where the United States brought into court certain defendants resulting in a decision in accord with A & P's attitude. United States v. Food and Grocery Bureau of Southern California, D.C., 43 F.Supp. 966. Defendants refused to join associations in Illinois, Ohio, Wisconsin and Nebraska. They did join associations in Baltimore, Philadelphia, Pennsylvania, and in some of the New England states but claimed that nothing transpired in any of these with the knowledge of headquarters that resulted in violation of the anti-trust law, that is fixing prices or otherwise. A & P pleaded nolle contendere in one or more instances, though it contended that there had been no violation of law. On the whole, it must be agreed that headquarters' policy was against fixing prices. Irrespective of this, however, various representatives of the group did engage in certain activities that participated in and promoted fixed prices.

Defendants offered evidence that memberships were unauthorized and insist that the associations were not active beyond the state. In this respect, defense relies upon Truck Drivers' Local No. 421, etc., v.

United States, 8 Cir., 128 F.2d 227, 235, where the court said: "We do not believe that * * * the actions of the milkmen's division and its members, the efforts of the president of the union and the hearings held by the disputes committee and the executive board could be imputed to the union as a matter of general agency. To bind the union in a situation such as this, actual and authorized agency was necessary; mere apparent agencyw ould not be sufficient * * * unless the circumstances were so strong as competently to support an inference of actual authority." In Nobile v. United States, 3 Cir., 284 F. 253, 255, the court said: "Criminal liability of a principal or master for the act of his agent or servant does not extend so far as his civil liability. He cannot be held criminally for the acts of his agent, contrary to his orders, and without authority, express or implied, merely because it is in the course of his business and within the scope of the agent's employment, though he might be liable civilly." See also Paschen v. United States, 7 Cir., 70 F.2d 491, 503; United States v. International Fur Workers Union, 2 Cir., 100 F.2d 541.

There is some evidence of understandings with suppliers fixing resale prices. When the Staley Company in May, 1939, suggested a retail price upon its products, defendants agreed to maintain the suggested price, inasmuch as headquarters had an advertising agreement with the manufacturer. In 1940 they agreed with Hormel to advance retail price to 25¢ per can on Spam, in view of the fact that Hormel's other customers were doing so. There were similar instances with the Birdseye Frozen Foods, Gulf Coast Tobacco Company, Stephans Brothers and others. The activities were in the face of legal advice "that the company will be reasonably safe if it wishes to adhere to a suggested price, so long as it has no conversations or correspondence with the manufacturer concerning it. The company should refuse to give the manufacturer any assurances that it will follow his suggested price, even if it intends to do so."

There can be no doubt but that some of A & P's agents' activities went beyond what could legally be done. But the question confronting me is whether there is evidence to charge defendants with knowledge and responsibility therefore. Apparently A & P's counsel were at all times desirous of preventing activities from over-reaching the law but just as apparently their advice was not always followed. I shall not elaborate upon the evidence in this respect for I think it unnecessary to consider at length this disputed factual situation in view of my ultimate conclusion.

### Alleged False Front Activities.

There is no question that A & P through Better Business Organization, Inc., and Carl Byoir, built up associations for the purpose of protecting what were conceived to be the rights of A & P and that those associations appeared to the public as independent organizations, even though they were financed, in some cases, entirely by defendants. These included a state wide campaign against special taxes on supermarkets in New Jersey called the Emergency Tax Council of New Jersey, apparently the idea of Byoir. Though it was stated openly that A & P was contributing to the cost, it was never revealed to the public that it was the sole responsible party back of the organization. The National Consumers Tax Commission was incorporated under the laws of the state of Illinois in June, 1938 for the ostensible purpose of studying taxes. This, too, was the creature of defendants through the instrumentality of Byoir. MacKeachie said: "It has never been quite clear in our minds as to how definite this National Consumers' Tax Commission can be in actual fight, nor as to whether or not the financial support of this organization by our company is in the open. If this is not the case and the NCTC should take a position against the chain store tax question and if it later came out that the organization was formed under the auspices of Carl Byoir and Associates and financed by our company, we feel this would have a very detrimental effect on our cause." I shall not prolong this memorandum with further recital of the details. Suffice it to say, the organization was in effect the creation of defendants and the

public could not have been and was not aware of the full extent of their sponsorship or of A & P's responsibility for its existence.

Byoir also proposed to Hartford, the establishment of an agricultural relations department to operate on a national scale in educating farm groups on the problems of mass distribution. The record is persuasive that this proposal contemplated serving the interest of defendants and that the true nature of their sponsorship was not publicized. A & P's interest in neither the Pennsylvania Chain Store Council in 1941 nor the National Drainage Levee and Irrigation Association was announced. The evidence elaborating upon these activities I think it unnecessary to discuss, for there can be no question but that defendants did build up organizations, make contacts and engage in other activities behind cover. What if anything those activities have to do with innocence or guilt is another question.

### Defendants' Expressed Policies.

Defendants' expressed policy is reflected by its letters, minutes and documents over the years. I shall refer to a few of these as fairly illustrative. Concerning gross profit rates, August 15, 1934, at an Executive Committee Meeting of the New England division, it was said: "With competition as aggressive as it is in this territory at the present time, we can not increase our gross profit rate. Prices must be kept in line at all times with competition. * * * Our only salvation is increased volume, which will automatically reduce our expense rate and thus improve the general picture for the division." At an Executive Committee Meeting of the Central Western division on April 9, 1936, concerning coercion, it was announced: "We must not by word or deed let the impression get abroad that we are at any time attempting to put anyone out of business. One or two instances of this have come to our attention and represent something strictly contrary to the Company's policies."

Concerning buying policy, counsel's letter of October 28, 1936, advised: "There should be no tactics employed which would even hint at being coercive. Quite natural-

ly we want to buy our merchandise on the best possible basis, but this does not mean you should 'go after' a seller, or trade in such a manner that he might accuse us of attempting to induce him to sell you at a lower price."

As to the policy as to brokers, a memorandum of general conference on January 25, 1938, recited that "the meeting decided to move in an orderly fashion toward procuring supplies of merchandise through sellers who do not employ brokers. This would remove the hazard of the Federal Trade Commission, interpreting a lower legal price which we pay for an article as one which reflects the brokerage or allowance in lieu of brokerage. * * * our acceptance of 'allowances and discounts in lieu of brokerage' in whatever form is not permitted. It developed that it was not beyond the Commission's power to interpret an advertising allowance as one 'in lieu of brokerage.' The Chairman, therefore, ordered a close scrutiny of all existing advertising contracts to satisfy the Company that these were regular in every way. Quantity discount agreements will likewise be subject to the same inspection." Zoller wrote Parr March 6, 1940: "Our aim in all moves is to comply with the law and the best way to do it is to buy from exclusively direct sellers." And Bofinger said to his Purchasing Directors, September 15, 1941: "* * * about meeting competition, it is to be noted that any statements about competitive quotations made by a buyer for the purpose of inducing a seller to discriminate in price would violate both the Act and our Company's instructions and would subject us to possible prosecution."

Discussing below-cost selling, at the Sales Directors' Meeting March 30–31, 1927, it was said: "We would not sell below cost. Sometimes competition sells below cost and it was questioned whether we should meet such prices." At a Divisional Presidents' Meeting February 20, 1939, it was recorded: "A previous ruling that we not sell merchandise below our net replacement cost has been taken advantage of by some competitors. It was therefore decided that each President should decide when he considered it necessary to meet such competition within his division." At

an Executive Committee Meeting of the Central division, June 2, 1931, it was declared: "Regardless of the action of competitors, we should not sell below cost of replacement. Our competitors cannot continue such practices. We should feature other commodities and sell the entire line as low as is consistent." And at a Division Presidents' Meeting June 25, 1931, it was said that "any man in the organization who knowingly permits wholesaling will be discharged."

As to price zoning, it was said "consideration should be given those cities in which prices vary in different stores of the same type. Difficulties may arise if these different prices cannot be satisfactorily explained by a difference in costs—such as trucking—or by proof that we are meeting legitimate competition."

Concerning competition, it was asserted at the Executive Committee Meeting of the New England division on July 19, 1932: "We should not permit any competitor, whether chain or voluntary chain, to present a better proposition to the public than we do. This is a matter to be regulated locally by the various unit heads. * * * considerable leeway has been granted to the unit heads in the fixing of prices to meet competition. We must not sell under cost, but beyond this the unit head has greater flexibility in meeting competition than heretofore has been the case, provided we stay within the budget predictions for net profit." On October 20, 1932, it was said "It is important that the Sales Department in each unit keep a close check on the prices charged by voluntary chains and see that our prices are at least in line with theirs, if not lower." The Presidents' Meeting, August 31, 1937, announced: "It was decided to decrease the gross profit for the third quarter 1% below that of the second quarter in an effort to increase average sales $100. The decrease is to be initiated by an immediate reduction of shelf goods items not exceeding an average of $100 per store; and on June 24, 1941 the Chairman recommended a lower gross profit program for the balance of the second quarter. Such action would further the policy of passing on to its customers in

retail prices all possible savings in the operation of the business."

Discussing price-fixing the Divisional Presidents' meeting in February, 1926, recorded in its minutes: "The consensus of opinion was that it was bad to enter into an agreement with any manufacturer to maintain a fixed retail price. * * * Our policy of not making any deals with manufacturers who dictate retail prices was mentioned, and the meeting went on record for continuance of this policy." Hoadley wrote on February 10, 1939 "Pressure from several groups outside the Company tending toward maintenance of retail price program, suggests again outlining the Company's policy in opposition to joining any such group." Counsel wrote on November 25, 1940 "Sheridan's statement necessarily implies the adoption and circulation of price lists. It has been our uniform position, that such a course is violative of the Antitrust laws and would ultimately involve us in hurtful litigation. * * * Our position was and is that the wholesale grocers could not fix resale prices of a commodity wherein they had no element of good will to protect, but that resale prices can only be fixed by those who are financially interested in not cheapening or destroying the good will attached to the name of the producer or manufacturer of a certain commodity." On April 8, 1941 at a Divisional Presidents' meeting, it was stated that "the company should refrain from participating in these organizations and withdraw from those which it now belongs to where the legal department feels there is any question as to the legality of the activities engaged in." And the Merchandising Committee meeting, the following month announced: "While the distinction between agreeing to a resale price and simply following a suggested price is sometimes difficult, we feel that the company will be reasonably safe if it wishes to adhere to a suggested price, so long as it has no conversations or correspondence with the manufacturer concerning it. The company should refuse to give the manufacturer any assurances that it will follow his suggested price, even if it intends to do so." French wrote on July 14, 1942

"neither this company nor A & P will discuss its retail prices or retail price policies with anyone outside of company personnel; under no circumstances will either company make any agreement, expressed or implied, with any competitor or person representing competitors on the subject of prices. To enter into such discussions or agreements would subject the companies to possible prosecution for violation of the Anti-trust laws. Apart from this, it is fixed company policy to establish our prices and price policies in our own discretion without seeking or accepting advice, suggestions or instructions from outside sources."

As I approach the conclusion of my consideration, it may be helpful to take note of certain general facts. To buy, sell and distribute to a substantial portion of a hundred and thirty million people, one and three-quarter billions dollars worth of food annually, at a profit of one and one-half cents on each dollar, is an achievement one may well be proud of. No place in the world, I take it, are people so well fed as in the United States. Nowhere else, I suppose, do food distributors accomplish efficient distribution at so low a margin of profit. In contrast, we are told, in other nations the problem is not one of an adequate diet but one of any diet at all.

The nation of Thomas Jefferson or even of Abraham Lincoln was largely an agricultural domain. In contrast we are now a nation containing tremendously congested metropolitan centers. A hundred and thirty million people breakfast, lunch and dine daily, usually without discomfort or lack of nourishing food. Daily to our congested centers come products from California, Florida, Texas and every other state in the union. Our national life has lost its simplicity. Our problems have multiplied— our suggested remedies for resulting ill-fits in society and political economy have become multitudinous. For years our congress and courts have struggled with the problem of preservation of free competition; prevention of preferential treatment. The enactment of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., saw the end of illegal rebates by railroads to shippers. The Sherman Act enacted into federal law common law offenses in restraint of trade and monopoly and attempted to keep the lines of competition free and open. Other acts of similar or supplemental character have become a part of the regulation of industry in this country, necessitated, as Congress has thought, by the growing complexities of our industrial and economic operations.

Centralization of industry and population have led to centralization of governmental authority and a greater extension of governmental participation in our private affairs. Over a period of years, legislation has been the Congressional remedy, resulting in more and more regulation. Whether this greatly centralized regulation constitutes a wise policy, of course, is not for the courts to decide, for it is by the standard of policy established by our policy makers, our Congress, that we must test the legality of alleged transgressions. Questions as to social and economic philosophy or political ideology are not for the court.

So the chain store system, as compared with independents, is not in issue in this case; nor is A & P's size, alone, of importance. The latter becomes material only when the facts disclose illegal use of such power. Integration, whether longitudinal or vertical, or both, is not, of itself, a violation of the law, but as I conceive the applicable legal formula, if the nature and activities of that integration are of such character as to reflect the inherent vice of unreasonable restraint of commerce or the inevitable evil of an attempted monopoly, then a violation of the law occurs. In other words, if, in spite of a declaration of innocence of purpose, conscious acts of a group are such as inevitably to work undue restraint of trade or a monopoly, in whole or in part, the actors thereby bring about transgression of the congressional rule of conduct.

Sometimes I doubt whether we ever needed the Robinson-Patman law, with all its elusive uncertainty. I have thought that the Sherman Act, properly interpreted and administered, would have remedied all the ills meant to be cured. More comprehensive language than that found in the Sherman Act is difficult to conceive. Declared illegal in section one is "every con-

tract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * *" ; and "every person" who shall make such a contract or engage in such a combination or conspiracy is deemed guilty of a misdemeanor. Section two is not less sweeping. "Every person" who monopolizes, or attempts to monopolize, or conspires with "any other person" to monopolize, "any part of the trade or commerce among the several States" is, likewise, deemed guilty of a misdemeanor. The text reveals a carefully studied attempt to bring within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states. That Congress desired to go to the utmost extent of its constitutional power in preventing restraints of trade and attempts to monopolize, such as the information charges here, appears very clear. The obvious purpose was to use that power to preserve a competitive business economy. This plan, this mechanism did not break down; it has never needed more than proper execution and proper enforcement. Too often, I fear, we enact a new law to cure maladministration of an old one. So Congress enacted the Robinson-Patman Act. I doubt if any judge would assert that he knows exactly what does or does not amount to violation of the Robinson-Patman Act in any and all instances. Mr. Chief Justice Hughes exclaimed to the Federal Bar Association in 1931: "How difficult it is to secure legislation that is simple and unequivocal." The early comment of Bentham is applicable: " * * * these law books must be made up into sentences of moderate length, such as men use in common conversation, and such as the laws are written in in France, with no more words than are necessary; not like the present statutes in which I have seen a single sentence take up 13 such pages as would fill a reasonable volume, and not finished after all * * *." See Law Notes, Vol. L, No. 1, p. 11, February 1946.

Later Congress enacted the Miller-Tydings law, so that now the American merchant must steer his course between the perils of Scylla on one side and Charybdis on the other, for, under the Fair Trade Acts of various states and the Anti-trust Act of the federal government, the merchant must steer his course between two fatal hazards. He must fix his retail prices in accord with the state law and avoid the slightest deviation therefrom, lest, in doing so, he violate the federal law.

But I am not concerned with any legislation other than the Anti-trust Act. My question is whether the sayings and actions of defendants, whether violations of the Robinson-Patman Act or other legislative enactment or not, amount inherently to a violation of the Sherman Act. We must bear in mind that the same act or the same course of conduct may violate two statutes. Burton v. United States, 202 U.S. 344, 377, 380, 381, 26 S.Ct. 688, 50 L.Ed. 1057, 6 Ann.Cas. 362; Gavieres v. United States, 220 U.S. 338, 342–344, 31 S.Ct. 421, 55 L.Ed. 489; Morgan v. DeVine, 237 U.S. 632, 639–641, 35 S.Ct. 712, 59 L. Ed. 1153; Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306; Montrose Lumber Co. v. United States, 10 Cir., 124 F.2d 573, 575.

It is clear from this record that retail distributors of food products in the United States are engaged in a close contest. Profit margins are slight. The difference between profitable operation and loss is fractional in character; between success' and failure, astonishingly small. There is constant incessant struggle for advantages. In such a situation, where margins between profit and loss are so small, any dealer engaged in the contest, having secured an unfair advantage over his competitors, however small it may be, will be likely to upset or reverse a small percentage of profit in his competitor and convert it into a loss. When the net profit is in the neighborhood of 2%, an advantage of 5% in buying in one dealer immediately places him in an over-powering position so far as his competitors are concerned. So if any element of A & P's profits in competition with others arises from an illegal factor or an illegal function, even though the percentage resulting from the use of that factor or that function is small, it may be sufficient to change a competitor's profit into losses. Such a result, of course, is interference with open competition, undue restraint of trade.

678

As I view this evidence there can be no dispute but that an illegal factor exists in the operating relationship between A & P and Acco. The illegal acts of Acco, A & P's other self, the reception of benefits by A & P from such illegal action, permeating the entire group's activities, wherein all participants knowingly aid and promote the admitted operation of Acco and A & P, results in practices violative of the true conception of the Anti-trust Act. If I assume for the purpose of disposition of this case that in general the policy of A & P was to operate within the law and attribute to defendants a desire to comply with the law, there still remains the conscious, knowing adoption by all defendants of a plan of action by Acco affecting every department of A & P and every retail store, which can not be squared with the intent and purposes of the Act. It must be admitted that all defendants knew what Acco was doing. There is no question but that all defendants acceded to Acco's practice or but that all defendants, representing one or more of the allied corporate entities, being fully aware of what was being done, tacitly agreed to and did go along with such plan of operation. They can not be heard to say that they did not intend to violate the Anti-trust Act, when they voluntarily accepted and adopted a plan of operation which inevitably and inherently tends to restrain trade and to create a partial monopoly. Thus in Screws v. United States, 325 U.S. 91, at page 96, 65 S.Ct. 1031, 1033, 89 L.Ed. 1495, the court repeated what it had said in Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 51 L.Ed. 1047, 11 Ann.Cas. 589, saying: "If a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent." In Bigelow v. RKO Radio Pictures, 7 Cir., 150 F.2d 877, 882, the Circuit Court of Appeals for the Seventh Circuit said: "Knowing participation by competitors without previous agreement in a plan, the necessary consequence of which if carried out is unreasonable restraint of interstate commerce, is sufficient to establish an unlawful conspiracy. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610." While it is true in a very general sense that one can dispose of his property as he pleases, he can not "go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade." United States v. Bausch & Lomb Co., 321 U.S. 707, 722, 64 S.Ct. 805, 813, 88 L.Ed. 1024.

It is probably true that many actions of defendants of which the Government complains, standing alone, are devoid of wrongful character, but when the fabric woven from them is considered as a whole and it appears contaminated by a corrupt thread running throughout the completed texture, the whole becomes a tainted product and all partaking in its creation, having voluntarily contributed to the structure, are charged with responsibility for the fabrication. The conduct of Acco is the rotten thread of the fabric, and it so permeates the entire texture and ties together the other threads as to result in an imperfect, an illegal product,—unreasonable interference with competition and power to monopolize. With the flaw of Acco's tainted record permeating all the operations of A & P's integrated system, the activities of A & P other than those directly involving Acco take on a polluted colored light. Manipulation of gross profit rates, at times sufficiently to do away entirely with retail profit, in competition, procurement and enjoyment of buying preferences heretofore discussed, whether in the form of discriminatory discounts, advertising allowances or otherwise, supplementing retail earnings or overcoming deficits with earnings of manufacturing subsidiaries, the coffee department and Acco, and other actions heretofore mentioned, even though some one or all of them standing alone might not amount to a violation of the law, when coupled and inextricably interwoven with the activities of Acco, reflect inevitably the misuse of defendants' power in competition with others to such an extent as to create undue interference with commerce—undue restraint of trade—of such character as to result in monopoly.

██ Despite the claim of high character of the general business and economic policy of defendants, I can not escape the conviction that, by their cooperation in the promotion of the plan of operation which involved illegal action, illegal restraint of trade, they rendered themselves subject to the penalties of the law. Congress did not condone good trusts and condemn bad ones; it forbade all. It is no excuse for unreasonable restraint or monopoly that such interference with free competition has not been utilized to extract from consumers more than a "fair" profit. United States v. Aluminum Co., 2 Cir., 148 F.2d 416. As I view it each and every defendant, corporate and individual, was aware of the plan, consciously participated in it, and must be held to have violated the law in both respects mentioned in the information. In this connection I think it only proper to say that usually a violation of the Sherman Act is not an ordinary crime. Violation is ordinarily an economic offense, the seriousness of which is not related to the moral turpitude of the offender.

It is charged that the offenses were carried out partially within the Eastern District of Illinois. Defendants question the sufficiency of the proof to show that the court has jurisdiction, in other words, whether there is evidence of acts within the district sufficient to give the court the right to decide the issue presented. In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 857, 84 L.Ed. 1129, the Supreme Court had under consideration a similar question under a charge of unreasonable restraint of commerce through the fixing of prices for oil. Defendants insisted that there was no evidence to support jurisdiction in the Western District of Wisconsin. The Supreme Court said: "Respondents, though agreeing that there were such sales in the Mid-Western area and that the prices on such sales were affected by the rise in the spot markets, deny that they were overt acts in pursuance of the conspiracy. Rather, they contend that each of such sales was an individual act of a particular conspirator in the ordinary course of his business by which he enjoyed the results of a conspiracy carried out in another district. That is to say, they

take the position that the alleged conspiracy was limited to a restraint of competition in buying and selling on the spot markets and included no joint agreement or understanding as respects sales in the Mid-Western area. * * * Conspiracies under the Sherman Act are on 'the common-law footing'; they are not dependent on the 'doing of any act other than the act of conspiring' as a condition of liability. Nash v. United States, 229 U.S. [373], at page 378, 33 S.Ct. [780], 57 L.Ed. 1232. But since there was no evidence that the conspiracy was formed within the Western District of Wisconsin, the trial court was without jurisdiction unless some act pursuant to the conspiracy took place there. United States v. Trenton Potteries Co., 273 U.S. [392], pages 402–403, 47 S.Ct. [377], 71 L.Ed. 700, 50 A.L.R. 989, and cases cited." The court concluded: "In sum, the conspiracy contemplated and embraced, at least by clear implication, sales to jobbers and consumers in the Mid-Western area at the enhanced prices. The making of those sales supplied part of the 'continuous cooperation' necessary to keep the conspiracy alive. See United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168. Hence, sales by any one of the respondents in the Mid-Western area bound all. For a conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act.' United States v. Kissel, supra, page 608 of 218 U.S., 31 S.Ct. [124], 54 L.Ed. 1168." A more complete exposition of the reason for such a conclusion appears in Hyde v. United States, 225 U.S. 347, on pages 362, 363, 364, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas. 1914A, 614 and 365, where the court discussed the problem at some length. See also Brown v. Elliott, 225 U.S. 392, 32 S.Ct. 812, 56 L.Ed. 1136; 28 U.S. C.A. § 42 and 103.

██ Here, in view of the facts previously referred to concerning the Brillo, McKinzie, Hunter Packing Company and Ralston-Purina incidents and of defendants' practice in their retail stores within this district, all partaking of the inherent vice I find in defendants' activities, acts in pursuance of the illegal undertaking oc-

680

curred within the district and this court has jurisdiction.

In view of what I have said, it follows that all defendants are guilty in manner and form as charged in the information. I reach this conclusion after careful objective consideration of all facts presented to me. What I have said is not intended to be a scholarly exposition of the law but it is, I hope, sufficient indication of the method I have used and the reasoning I have employed to reach my conclusion.